

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Michelle V. Larson*

**Signed April 15, 2026**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **In re:** | **CASE NO. 24-33952** |
| | **(CHAPTER 7)** |
| **RICHMONT CAPITAL PARTNERS VII, LP,** | |
| **Debtor.** | |
| | |
| **DANIEL D. BOECKMAN, individually and as trustee of the Duncan E. Boeckman Bypass Trust, Daniel D. Boeckman Trust and Kathryn Boeckman Howd Irrevocable Trust, KATHRYN BOECKMAN HOWD as Trustee of the Kathryn Boeckman Howd Trust, ELIZABETH M. BOECKMAN, AND BCE RALLY, JV,** | **ADVERSARY NO. 25-03042-mvl** |
| | **Related to ECF No. 20** |
| **Plaintiffs** | |

1

|  |  |
|---|---|
| **v.** | § |
|  | § |
| **JOHN P. ROCHON, JOHN ROCHON, JR., and HEIDI ROCHON HAFER** | § |
|  | § |
|  | § |
|  | § |
|  | § |
|  | § |
| **Defendants.** | § |

## <u>MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS</u>

**I.    <u>INTRODUCTION</u>**

Before the Court is the *Motion to Dismiss Third Amended Complaint* and *Brief in Support* (collectively, the "**Motion to Dismiss**") filed by Defendants John P. Rochon ("**Rochon**"), John Rochon, Jr. ("**Rochon Jr.**" collectively with Rochon, the "**Rochons**"), and Heidi Rochon Hafer ("**Hafer**") on November 21, 2025.[1] Through the Motion, the Defendants seek to dismiss the *Plaintiffs' Third Amended Complaint* (the "**Complaint**") filed on October 22, 2025, by Daniel D. Boeckman ("**Boeckman**"), individually and as trustee of the Duncan E. Boeckman Bypass Trust (the "**Duncan Trust**"), Daniel D. Boeckman Trust (the "**Daniel Trust**"), and Kathryn Boeckman Howd Irrevocable Trust (the "**K. Boeckman Irrevocable Trust**") (collectively, the "**Boeckman Trusts**"), Kathryn Boeckman Howd ("**Howd**"), as Trustee of the Kathryn Boeckman Howd Trust (the "**K. Boeckman Trust**"), and BCE Rally, JV ("**BCE**") (collectively, the "**Plaintiffs**" or the "**Boeckman Parties**").[2]

On January 8, 2026, the Court held a hearing on the Motion to Dismiss. Counsel appeared for the Defendants and the Plaintiffs. After considering the issues presented, the applicable case law, and the briefing and oral arguments of counsel, the Court concludes that the Motion to Dismiss should be GRANTED in part and DENIED in part as more particularly detailed hereinafter.

---

[1] ECF No. 20. All ECF No. references are herein made with respect to the docket in Adversary Proceeding No. 25-03042-mvl.
[2] ECF No. 13.

2

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and this matter is a statutorily non-core proceeding under 28 U.S.C. § 157(b)(2) with primarily non-core causes of action. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    FACTUAL BACKGROUND[3]

This dispute arises from a series of investments the Boeckman Parties made in Richmont Capital Partners VII, LP ("**RCP VII**") between January 2022 and May 2023.[4] The Boeckman Parties collectively invested $2,175,000 in RCP VII based on representations that the partnership deployed investor funds through a fully automated, algorithmically governed trading platform known as "Rally"—a platform they allege was never what it was described to be.[5] When the strategy ultimately collapsed under the weight of an alleged unauthorized, manually manipulated short position on the S&P 500 index, the Boeckman Parties lost $2,068,796.11.[6] They now bring claims for negligent misrepresentation, common law fraud, violations of the Texas and Delaware Securities Acts, civil conspiracy, and aiding and abetting against Rochon, Rochon Jr., and Hafer.[7]

### A.  The Solicitation

The chain of events that produced these investments began on June 17, 2021, when Chad Gross ("**Gross**")—a third party whom the Plaintiffs allege "acted on the directions of Rochon and Rochon Jr."—contacted Boeckman by text message, email, and written presentation to solicit investment in Rally.[8] Gross communicated using an email account bearing the domain "@richmont.net" and a signature block identifying him as an employee of "Richmont Holdings."

---

[3] For purposes of this Order, the factual background is based upon the facts contained in the Complaint, which the Court accepts as true for purposes of the Motion in accordance with established authority.
[4] *See generally* ECF No. 13. All ECF No. reference herein made with respect to the docket in Adversary Proceeding No. 25-03042-mvl.
[5] *See id.* at 6–9.
[6] *See id.* at 9–12.
[7] *Id.* at 15–20.
[8] *Id.* at 4.

3

That signature block contained a hyperlink directing recipients to a website for Richmont Capital Partners, which displayed both Rochon and Rochon Jr. as members of Richmont's "Team."[9]

The representations Gross made on June 17, 2021 were specific. In a text message that day, he told Boeckman that the Rochons "had acquired a systematic trading platform that [was] 100% liquid, average[d] returns of 2% per month," and had never experienced a down month.[10] In an email that day, Gross again represented that Rally had "never had a down month" and averaged 24% annual returns, net of fees, powered by a "machine learning Bot" capable of identifying "historical inflection points in highly liquid instruments."[11] A written presentation that same day specified that: the entire investment cycle was algorithmic and robotic; Rally had never lost a single trade; Rally only selected strategies achieving a perfect score; the funds' goal was the preservation of capital; no monthly management fees or hurdle rate applied; a 30% High Water Mark Success Fee governed performance compensation; and the principals of Rally were Levy, Lau, and Rochon.[12]

Gross's solicitation continued over the following months.[13] By November 2021, he represented that Rally had experienced only one losing trade across 15-months of operation and provided an illustration of how the fund had weathered a crash in oil markets through the use of "seven levels of stop loss" protection.[14] He reiterated that each individual trade carried a 2% stop loss as a core feature of the fund's "ultra-risk mitigation" mandate.[15]

---

[9] *Id.* at 5.
[10] *Id.* at 4.
[11] *Id.*
[12] *Id.* at 4–5.
[13] *Id.* at 5.
[14] *Id.* at 6.
[15] *Id.*

The Plaintiffs allege that the Rochons furthered the solicitation directly in January 2022, when they invited Boeckman to a dinner meeting.[16] During that meeting, both Rochon and Rochon Jr. stated that Rally comprised artificial intelligence and machine learning technology.[17] They repeated the representations that Gross made in prior communications and written materials, and they continued to emphasize the fund's liquidity, representing that investors could redeem their positions within as few as five days.[18]

### B. The Investments and Hafer's Role

Relying on these representations, Boeckman decided to invest his own funds and those of his family members.[19] On January 11, 2022, five of the Boeckman Parties executed Subscription Agreements with RCP VII and purchased limited partnership units for a combined $875,000.[20] Hafer executed each Subscription Agreement on behalf of RCP VII in her capacity as manager of its general partner, Rochon Trust.[21]

Shortly after this initial investment, Gross arranged for Boeckman and his sister, Howd, to attend two Zoom meetings with Levy and Lau—the developers of the Rally Platform—at which Gross, Levy, and Lau "illustrated Rally's capabilities to the Boeckman Parties."[22] The Boeckman Parties' confidence in the investment was not diminished by those meetings. To the contrary, by September 2022, BCE had contributed an additional $100,000, and the Duncan Trust had invested another $250,000, bringing the total committed capital to $1,125,000.[23]

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.* at 6–7.
[20] *Id.* at 7.
[21] *Id.*
[22] *Id.* at 7.
[23] *Id.* at 7–8.

On February 6, 2023, Gross and the Defendants transmitted to Boeckman and Howd a slide deck dated December 15, 2022.[24] The slide deck represented that: RCP VII operated "a proprietary artificial intelligence and machine learning platform owned and operated under Richmont Capital Partners;" Rally had "historically returned 4%-5% per month before fees;" RCP VII had "a subscription-based model" that could be cancelled at any time; the Rally algorithm "only invests in the most liquid instruments, mainly currency pairs;" the algorithm had "never made a losing trade;" and "there is no trade greater than 2% of investors' overall account, with a 2% Stop-Loss in place on each trade."[25]

In May 2023, Boeckman wired an additional $600,000 to RCP VII, and the Daniel Trust executed a Subscription Agreement and tendered $350,000—investments the Plaintiffs attribute to "the representations of Gross and the Rochons."[26] Hafer executed the corresponding Subscription Agreements.[27] The Boeckman Parties' total investments in RCP VII thereby reached $2,175,000.[28]

### C. The S&P 500 Short Position and Movement of the Stop Loss

The Boeckman Parties did not learn until late 2023 that their fund had gone into a concentrated short position on the S&P 500 index—"a stark contrast from the prior representations that investor funds would be invested primarily in currency pairs."[29] The Boeckman Parties allege they "never consented to this or any other investment" and "never selected the investments to be made with their monies."[30]

---

[24] *Id.* at 8.
[25] *Id.*
[26] *Id.* at 8–9.
[27] *See id.* at 7.
[28] *Id.* at 8–9.
[29] *Id.* at 9.
[30] *Id.*

The practical consequences of the undisclosed short position became apparent in December 2023, when the Boeckman Parties sought to withdraw $100,000 of K. Boeckman's funds.[31] Virginia Justice ("**Justice**"), communicating on behalf of RCP VII, responded that the withdrawal could not be processed because RCP VII was "waiting on [the SPX 500] trade to close," and expressed hope that the trade would close that week. By December 19, 2023, Justice reported there was "no new news on [the SPX 500] trade."[32] Inquiries through January and February 2024 met the same response—that the SPX 500 trade had not closed and "had a long tail."[33] These responses stood in direct contrast to prior representations that the investments offered five-day liquidity and that no single trade would occupy more than 2% of any investor's account.[34]

As the S&P 500 continued to rise and the short position's losses mounted, Boeckman emailed the Rochons directly on February 20, 2024, asking what the take-profit levels were for the trade and "where the Stop Loss [was]."[35] Rochon Jr. responded that "the math/algos are more involved; as the algos take into effect the nearly 30% rise that came first (and how it rose)," but did not disclose the stop loss level.[36]

On January 20, 2024—before Boeckman's direct inquiry—Levy emailed Rochon Jr., and based on information and belief Rochon and Hafer, to advise that it was not "easy days" with the SPX 500 trade.[37] Levy presented two options: move the stop loss, or "not touch anything and wait for a take profit or stop loss at 4940."[38] He quantified the loss at three stop loss points: (1) a 50% loss at 4,945, (2) a 65% loss at 5,045, and (3) an 80% loss at 5,150, and asked Rochon Jr. what he

---

[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *See id.*
[35] *Id.*
[36] *Id.*
[37] *Id.* at 10.
[38] *Id.*

7

wanted to do. Rochon Jr.'s response was succinct: "Let's move the stop loss to 5,150."[39] He did not confer with or seek consent from the Boeckman Parties before giving that instruction, did not notify them that any adjustment was under consideration, and did not disclose that the position had deteriorated to the point where such a decision had become necessary.[40] The Plaintiffs allege that this act of manually overriding the stop loss "represented an admission that Rally was not algorithmic and robotic, making his prior representations a flat out lie."[41]

On January 21, 2024, Lau wrote to Rochon Jr.—and, Plaintiffs allege, to Rochon and Hafer—warning that a stop loss at 5,151 would inflict approximately an 80% loss on investors, that clients might find that outcome unacceptable, and that Rochon Jr. needed to make them aware of the risk before proceeding.[42] Rochon Jr. responded in writing: "I talked to them yesterday."[43] The Plaintiffs allege that statement was false. He had not communicated with the Boeckman Parties about the stop loss adjustment, and they remained unaware that any change had occurred or was under consideration.[44] When Lau continued pressing the point, Rochon Jr. replied that he did not present "only downside topics" to his partners, and that his clients "ONLY invested because of [his] track record."[45] When Levy sought final confirmation, Rochon Jr. replied: "Yes, please increase the stop loss to 5,151."[46] The Plaintiffs allege that Rochon and Hafer were copied on this email exchange and received its full contents.[47]

---

[39] Id.
[40] Id.
[41] Id.
[42] Id. at 11.
[43] Id.
[44] Id.
[45] Id.
[46] Id.
[47] Id.

As the S&P 500 continued to climb in the weeks that followed, Lau and Levy again urged the Rochons to seek investor approval before making further adjustments to the position.[48] The Rochons nevertheless moved the stop loss a second time in February 2024, again without notifying the Boeckman Parties.[49] The Plaintiffs allege the Rochons once more falsely represented to Lau and Levy that investor consent had been obtained.[50] By March 2024, Lau was advising that margin exposure had pushed at least one investor account to the brink of forced liquidation, with other accounts facing similar predicaments.[51] The SPX 500 trade eventually closed, and the Boeckman Parties lost $2,068,796.11.[52]

## D. Discovery of the Alleged Misrepresentations

After the losses materialized and the Rochons ceased communications with the Boeckman Parties, Boeckman contacted Gross, who connected him with Levy and Lau.[53] Through those conversations, the Boeckman Parties learned information they allege directly contradicted the representations that had induced their investments.[54]

First, the Boeckman Parties learned that RCP VII did not own the Rally trading platform. Royal Algo, Ltd., an entity affiliated with Levy, owned the platform, which it licensed to Jameson Asset Management International, an entity affiliated with Lau.[55] RCP VII held only a non-exclusive sub-license to use the software.[56] When Levy and Lau learned that the Rochons had been representing ownership of the platform to investors, they informed the Rochons directly that this

---

[48] *Id.* at 14.
[49] *Id.*
[50] *Id.*
[51] *Id.* at 11–12.
[52] *Id.* at 12.
[53] *Id.*
[54] *See id.*
[55] *Id.*
[56] *Id.*

characterization was false, and that Rally did not rely on artificial intelligence.[57] The Plaintiffs allege that the Rochons continued to make or ratify these representations notwithstanding notice of the falsity of their representations.[58]

Second, the Boeckman Parties allege that they learned that the platform was not algorithmic or robotic in the manner represented.[59] Rochon Jr.'s unilateral decision to override the stop loss at his personal discretion demonstrated that the trade parameters were subject to human intervention at any point.[60] The Boeckman Parties also learned that the Rochons had directed the stop loss to be moved on more than one occasion without investor knowledge, apparently to defer disclosure of accumulating losses in investor portfolios.[61]

Third, the Boeckman Parties learned that RCP VII was not a limited partnership at all, but merely a "referral company" that directed investors to third parties to invest their funds.[62] The Plaintiffs allege this characterization directly contradicts the Subscription Agreements that Hafer executed on RCP VII's behalf throughout the investment period, as well as the prior representations that the Boeckman Parties were purchasing units of limited partnership interest in a fund that would manage their capital directly.[63]

The Plaintiffs allege that had any of these facts been disclosed at any point during the solicitation or investment period, they would not have made their investments.[64] A substantial portion of the invested capital, they note, had been earmarked to satisfy the Boeckman Parties'

---

[57] *Id.*
[58] *Id.*
[59] *Id.* at 13.
[60] *Id.*
[61] *Id.* at 13–14.
[62] *Id.* at 18–19.
[63] *See id.* at 6–7, 18–19.
[64] *See id.* at 6–7, 13.

10

2024 federal income tax obligations—funds committed to RCP VII precisely because of the safety and liquidity attributes the Rochons and their agents had represented.[65]

### E.  Procedural History

The Plaintiffs initiated this dispute on April 3, 2024, by filing their Original Petition in Texas state court against RCP VII, its general partner Rochon Trust LLC, and individual defendants Rochon and Rochon Jr. After RCP VII filed for Chapter 7 bankruptcy in the Eastern District of Texas on September 27, 2024, the Plaintiffs sought and obtained severance of their claims in state court against the non-debtor defendants.[66] The bankruptcy proceeding was later transferred to the Northern District of Texas,[67] and following discovery, the Plaintiffs filed a Second Amended Petition in state court adding additional claims and joining Hafer as a defendant.[68]

In March 2025, the Defendants claimed the Plaintiffs' state court litigation violated the automatic stay based upon the Plaintiffs' pursuit of estate-owned causes of action,[69] prompting the Plaintiffs to pause further action and seek clarification from the Court.[70] The Defendants then removed the severed action to this Court and filed a related adversary proceeding seeking declarations regarding ownership of the claims and applicability of the stay.[71] The Plaintiffs filed their *Motion for Order that Automatic Stay Does Not Apply or, in the Alternative, Motion for Relief from Stay* (the "**Lift Stay Motion**") on April 30, 2025, which the Chapter 7 trustee and the Defendants opposed.[72] The parties subsequently submitted competing briefing, and the Plaintiffs

---

[65] *Id.* at 13.
[66] Bankruptcy ECF No. 1; Bankruptcy ECF No. 27-1. "**Bankruptcy ECF**" shall refer to the bankruptcy docket in Case No. 24-33952-mvl7 (Bankr. N.D. Tex. 2024).
[67] Bankruptcy ECF No. 16.
[68] Bankruptcy ECF No. 27-5.
[69] Bankruptcy ECF No. 27-7.
[70] Bankruptcy ECF No. 27-10.
[71] *See Rochon v. Boeckman*, Adv. No. 25-3044-mvl (Bankr. N.D. Tex. Apr. 4, 2025).
[72] Bankruptcy ECF Nos. 27, 31, 32.

filed a Revised Proposed Order Granting Motion for Order for Order that Automatic Stay Does Not Apply, along with a draft of the Third Amended Complaint to clarify the direct non-estate claims they wished to pursue.[73]

Following a July 2025 hearing, the Court took the matter under advisement and ultimately granted the motion in part.[74] The Court concluded that most of the Plaintiffs' claims were direct— stemming from three distinct sets of alleged misrepresentations tied to separate investments— except for a single $250,000 investment by the Duncan Trust, which the court deemed insufficiently supported as a direct claim.[75] The Court then set detailed guardrails governing the permissible claims, damages theories, and factual bases the Plaintiffs would be allowed to pursue, and ordered the Plaintiffs to file same in the above-captioned adversary proceeding within 14 days.[76]

The Third Amended Complaint was filed on October 22, 2025.[77] In the Complaint, the Plaintiffs allege six causes of action: (1) Negligent Misrepresentation; (2) Common Law Fraud; (3) Violations of Texas Securities Act; (4) Violations of the Delaware Securities Act; (5) Civil Conspiracy; and (6) Aiding and Abetting Liability.[78] The Motion to Dismiss was filed on November 21, 2025.

### III.    STANDARD OF REVIEW

Rule 12(b)(6), incorporated by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizes dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In evaluating a Rule 12(b)(6) motion to

---

[73] Bankruptcy ECF No. 40.
[74] Bankruptcy ECF No. 50.
[75] *Id.* at 13.
[76] *Id.* at 21–23.
[77] ECF No. 13.
[78] *Id.* at 15–20.

dismiss, the Court must accept all well-pleaded facts as true, and view them in the light most favorable to the plaintiff. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (quoting *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 442 (5th Cir. 1986)). However, the Court need not "strain to find inferences favorable to the plaintiffs." *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This plausibility requirement sits somewhere between possible and probable, and is satisfied when the plaintiff's pleaded facts allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

Although the complaint is not required to provide detailed factual allegations, it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do it." *Twombly*, 550 U.S. at 555. However, numerous courts within the Fifth Circuit have reiterated that because "a complaint must be liberally construed in favor of the plaintiff, a motion to dismiss under Rule 12(b)(6) is generally viewed with disfavor and is rarely granted." *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ, 2021 WL 2546664, at *2 (Bankr. N.D. Tex. June 3, 2021) (citation omitted). In reviewing the motion, the Court looks to the pleadings, alongside any documents attached or incorporated into the complaint by reference. *See Mirant Corp. v. Southern Co.*, 337 B.R. 107, 115 (N.D. Tex. 2006).

Rule 8(a), in turn commands that all complaints must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a); FED. R. BANKR. P. 7008. Although a complaint need not contain detailed factual allegations, "plaintiffs must allege facts that support the elements of the cause of action," and "dismissal is proper if the complaint fails to allege a required element[.]" *Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2012); *Bazan v. White*, 275 F. App'x 312, 312–13 (5th Cir. 2008) (citing *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995))."Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief" and therefore fails to satisfy Rule 8(a). *Iqbal*, 556 U.S. at 678 (cleaned up).

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). Claims asserting fraud, fraudulent inducement, fraudulent concealment, and negligent misrepresentation are subject to the heightened requirements of Rule 9(b). *City of Miami Gen. Emps'. & Sanitation Emps'. Ret. Tr. v. Globe Life Inc.*, No. 4:24-CV-376, 2025 WL 2793800, at *3 (E.D. Tex. Sept. 29, 2025) (quoting *Firth v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998)). To meet the heightened particularity standard, a plaintiff pleading fraud must specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002)). In other words, Rule 9(b) requires the complaint to set forth with particularity the "who, what, when, where and how" comprising the alleged fraud. *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019).

IV.    **CROSS-CUTTING ISSUES**

14

## A.  Consideration of the Appendix

As a threshold matter, the Court must determine which material outside the pleading, if any, it may consider in resolving the Defendants' Motion to Dismiss. The Plaintiffs filed an *Appendix to Brief in Support of Response to Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint* (the "**Appendix**") that included: (a) a June 17, 2021 email containing a slide deck and limited partnership agreement; (b) a February 6, 2023 email containing a slide deck; (c) the Subscription Agreements; and (d) the RCP VII Limited Partnership Agreement.[79] None of these documents were attached to the Plaintiffs' Complaint.

Under established Fifth Circuit precedent, when ruling on a Rule 12(b)(6) motion, a court's review is generally limited to the complaint, its attachments, and documents that are referred to in the complaint and central to the plaintiff's claims. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). Generally, issues regarding attachments arise in the context of a defendant attaching documents to its motion to dismiss, s*ee, e.g., Collins*, 224 F.3d at 498–99; *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Roofing Designs by Jr, LLC v. Tapia (In re Roofing Designs by JR, LLC)*, Case No. 23-32275, Adv. No. 24-03079, 2026 WL 191908, at *3 (Bankr. N.D. Tex. Jan. 21, 2026); *Aurzada v. EastBanc Techs., LLC (In re Animo Services, LLC)*, Case No. 23-30035, Adv. No. 25-03016, 2026 WL 692379, at *9 (Bankr. N.D. Tex. Mar. 11, 2026); however, the Fifth Circuit has relied on documents attached by a plaintiff in response in opposition to a motion to dismiss where the documents were (1) explicitly referenced in the complaint; (2) acknowledged in the answers; and (3) attached to the plaintiff's response. *Walch v. Adjutant Gen.'s Dept. of Tex.*, 533 F.3d 289, 293–94 (5th Cir. 2008) ("[T]he court may consider any of the

---

[79] ECF No. 27.

following: '(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."(quoting *Robinson v. TCI/US W. Commc'ns Inc.*, 117 F.3d 900, 904 (5th Cir. 1997)). "Although the Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims." *Gore v. Cedar Hill Indep. Sch. Dist.*, No. 3:15-CV-3963-M-BN, 2016 U.S. Dist. LEXIS 119002, at *8 (N.D. Tex. July 26, 2016). In other words, a document or attachment is "central" when the plausibility of the claim turns on its contents, such that the plaintiff could not maintain the claim without it. *Roofing Designs by Jr, LLC*, 2026 WL 191908 at *3. If the document is not integral to the complaint, the court may not consider it without converting the motion into one for summary judgment. *See Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536–39 (5th Cir. 2003).

Using this framework, the Court declines to consider the Appendix for purposes of resolving the Motion to Dismiss. At bottom, the Plaintiffs seem to be using the Appendix to fill in the gaps of the Complaint with respect to Count IV for violation of the Delaware Securities Act, to show that Richmont was a Delaware limited partnership with Subscription Agreements containing Delaware choice-of-law provisions. Likewise, the Plaintiffs seem to be using the Subscription Agreements to highlight Hafer's role as a general partner of RCP VII, and how RCP VII executed every one of the Subscription Agreements with the Plaintiffs. Finally, the Appendix contains additional emails to show the contents of the "written presentation" and "slide deck" distributed to the Plaintiffs by Gross on behalf of the Defendants, to further allege the Defendants' role, knowledge, and intent in perpetuating the misrepresentations made to the Plaintiffs.

However, almost none of these allegations are included in the Complaint, and the attachments to the Response were not included with the Complaint. While it is true the Complaint contains references to the Subscription Agreements, including Hafer's signature on all of the agreements, there is almost no substantive reference to the Subscription Agreements in relation to any of the causes of action as they stand now. To consider these documents now would rework the Rule 12(b)(6) standard and allow the Plaintiffs to essentially course correct the Complaint through the Response without amending the Complaint. Thus, the Court declines to consider the documents included in the Appendix for purposes of resolving the Motion to Dismiss.

## B. Group Pleading

The Defendants move to dismiss the Complaint on the grounds that numerous allegations constitute impermissible *group pleading* in violation of Rule 9(b). Specifically, the Defendants argue that the Complaint repeatedly attributes fraudulent statements and conduct to "the Rochons" or "the Defendants" as a conjunctive unit, without identifying the "who, what, when, where, and how" of the statement required under Rule 9(b). *Askanase v. Fatjo*, 130 F.3d 657, 676 (5th Cir. 1997).

As applied to allegations involving multiple defendants, Rule 9(b) requires that the complaint enlighten each defendant's part in the alleged fraud. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004). The Fifth Circuit has made clear that it will not "construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual unless the connection between the individual defendant and the allegedly fraudulent statements is specifically pleaded." *Id.*

This prohibition, commonly referred to as the group pleading doctrine, reflects a substantive purpose underlying Rule 9(b) itself: to provide the defendants with fair and specific

17

notice of the fraudulent conduct attributed to them individually, so that they may mount a targeted defense. *See id.* at 362. That purpose is not served by allegations that attribute a series of fraudulent statements or acts to multiple defendants collectively, without identifying which defendant said or did what. As the Honorable Brantley Starr observed, "if saying 'you are a fraudster' is not enough, then saying 'y'all are fraudsters' likewise falls short of Rule 9's standards." *VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 655 (N.D. Tex. 2020).

The group pleading prohibition extends beyond fraud claims to encompass conspiracy and aiding and abetting allegations that sound in fraud, as those claims must also satisfy Rule 9(b)'s heightened pleading standard when they are grounded in the same fraudulent conduct. *Id.* at 653–55. At the same time, the Court is mindful that Rule 9(b) does not operate in isolation. While Rule 9(b) imposes a heightened pleading standard, it does not require a plaintiff to plead every evidentiary detail of the alleged fraud, particularly where information necessary to satisfy the particularity requirement lies exclusively within the defendants' control. *Id.* at 656 (citing *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

### 1. Allegations Attributed to "the Rochons" Collectively

The most significant group pleading challenge concerns the Complaint's repeated attribution of statements and conduct to "the Rochons" as a collective unit. This pattern appears throughout the Complaint and takes several forms.

#### i.  The January 2022 Dinner Meeting

The Boeckman Parties allege that in early January 2022, the Rochons invited Boeckman to dinner, and that "[d]uring this meeting, *the Rochons* stated that Rally was comprised of artificial intelligence and machine learning" and emphasized the fund's liquidity—repeating the prior

18

representations made by Gross.[80] This allegation attributes each representation to both Rochon and

Rochon Jr. without necessarily specifying what each individual said, whether one or both spoke

on each topic, or what each defendant obtained by making those representations.

The Defendants argue that this constitutes textbook group pleading under *Southland*. The

Court finds this argument has force but does not find it fully dispositive of the dinner meeting

allegations. In *VeroBlue Farms*, Judge Starr—whose opinion the Defendants themselves rely

upon—expressly clarified that the group pleading doctrine does not require "that a fraud claim can

only name one defendant;" plaintiffs are permitted "to allege that more than one defendant (i.e., a

group of named defendants) committed the same alleged act." 465 F. Supp. 3d at 655. The concern

animating the group pleading doctrine is the obscuring of individual responsibility—a problem

that is most acute when it is genuinely unclear which of several defendants bear responsibility for

a particular act. *See Southland*, 365 F.3d at 363–65. Where two defendants are alleged to have

jointly attended the same meeting and jointly made the same representations to the same audience,

the attribution of those statements to both defendants is not evasion; it is a description of shared

conduct. *See Clapper v. Am. Realty Invs., Inc.*, CIV.A. No. 3:14-CV-2970-D, 2015 WL 3504856,

at *3–4 (N.D. Tex. June 3, 2015) (declining to dismiss on the basis of group pleading where the

complaint refers to multiple defendants to allege that "each named defendant committed the

alleged acts.").

The Court finds that the dinner meeting allegations, read in the light most favorable to the

Plaintiffs, plausibly describe a joint solicitation in which both Rochon and Rochon Jr. participated.

At the Rule 12(b)(6) stage, the Court accepts as true the allegation that both Rochons were present

and both made the identified representations. The collective attribution of statements made at a

---

[80] ECF No. 13 at 6.

19

single joint meeting by two individuals who both participated in it does not, standing alone, render the allegation deficient under Rule 9(b). *Id.* at 4. To hold otherwise would require the Plaintiffs to artificially disaggregate the conduct of the defendants who acted in concert—a result the pleading rules do not compel. *Id.*

The dinner meeting allegation does, however, suffer from a different and independently significant deficiency: it contains no allegations that the statements made at that meeting were false when made, or that either Rochon knew of their falsity at that time. Rule 9(b) requires not only that a plaintiff identify what was said and by whom, but also the circumstances that rendered those statements fraudulent—including, at minimum, why the speaker had reason to know the statement was false. *See Askanase*, 130 F.3d at 676. The Complaint alleges falsity generally and incorporates those allegations by reference, but it does not specifically connect the allegation of known falsity to the statements made at the January 2022 dinner. This gap, while perhaps curable by amendment, represents a pleading deficiency the Court cannot overlook and it will be addressed in the count-specific analysis below.

### ii.    The February 2023 Slide Deck

The Plaintiffs allege that on February 6, 2023, "Defendants and Gross delivered a slide deck presentation to Boeckman and Howd."[81] This attribution to "Defendants and Gross" collectively is the clearest instance of improper group pleading in the Complaint. The slide deck itself is the vehicle through which several of the most specific and concrete, alleged misrepresentations in this case were conveyed, including the representation that RCP VII owned the Rally platform, that the algorithm had never made a losing trade, and that a 2% stop loss protected each position.[82] Those representations are significant, and, if false, potentially

---

[81] ECF No. 13 at 8.
[82] *Id.*

20

actionable. The problem is that the Complaint provides no basis for attributing any of them to any specific defendant. It does not allege which defendant was responsible for the content of the slide deck, which defendant authorized or directed its preparation, which defendant reviewed and approved its representations before transmission, or which defendant instructed Gross to deliver it. The allegation that all Defendants and Gross collectively "delivered" the slide deck tells the court nothing about which defendant, if any, bears legal responsibility for the representations it contains.[83]

This type of collective attribution of marketing and promotional materials to multiple defendants without specific identification was squarely rejected in *Moore v. Payson Petroleum Grayson, LLC*, in which the Court dismissed allegations that "[d]efendants disseminated to plaintiffs offering documents… containing [] untrue statements of material facts and/or omission of material facts, and reiterated to plaintiffs the same, in meetings, communications, at investor events, dinners, and sales presentations." No. 3:17-CV-1436-M-BH, 2018 WL 793800, at *5 (N.D. Tex. Jan. 22, 2018). The court in *Moore* held that allegations which "lump all defendants together, failing to segregate the alleged wrongdoing of one from those of another" do not satisfy Rule 9(b). *Id.* The Complaint's slide deck allegation suffers from the same deficiency condemned in *Moore*. As a matter of individual attribution under the group pleading doctrine, the allegation that "Defendants and Gross" collectively delivered the slide deck does not adequately identify which defendant bears direct responsibility for its contents.

The group pleading deficiency, however, does not end the analysis of the slide deck's representations. The question of whether a specific defendant is individually responsible for a statement is distinct from the question of whether a defendant may be vicariously liable for a

---

[83] *Id.*

statement made by his agent. *See infra* Section IV.C. The group pleading doctrine addresses the former—it requires that each defendant's individual role in the fraud be specifically pleaded. *Southland*, 365 F.3d at 365. Agency law addresses the latter—it provides that a principal is liable for the representations of an agent made within the scope of the agent's authority, regardless of whether the principal personally authored or transmitted those representations. *See Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998). These are independent legal theories that ask different questions about the same set of facts.

As the Court addresses in Section IV.C below, the Complaint adequately pleads an actual agency relationship between the Rochons and Gross for purposes of Rule 12(b)(6). If Gross acted as the Rochons' agent with authority to solicit investments and make representations on their behalf, then his transmittal of the slide deck was conduct within the scope of that authority, and the Rochons are vicariously liable for the representations the slide deck contained under the doctrine of respondeat superior, not because the group pleading allegation is cured, but because agency liability offers an alternative theory of attribution. The Rochons' liability for the slide deck thus rests not on any finding that either Rochon individually authored or directed it, but on the finding that Gross transmitted it as their agent within the scope of the authority the Rochons conferred upon him.

Accordingly, the slide deck allegation would be deficient as a matter of group pleading to the extent it purports to establish direct individual liability of any specific defendant for the slide deck's contents. To the extent the slide deck's representations are attributed to Gross as the transmitting party, however, the Rochons' vicarious liability for those representations is adequately supported by the agency analysis provided in Section IV.C, and the fraud-based counts are not dismissed on group pleading grounds as to the slide deck's representations.

22

###### iii. *General Conjunctive Attributions*

Beyond the dinner meeting and slide deck, the Complaint contains numerous allegations of representations attributed conjunctively to "the Rochons"—presumably Rochon and Rochon Jr.—without further differentiation. Simply listing two defendants' names before a general recitation of alleged misrepresentations does not satisfy Rule 9(b)'s requirement that each defendant's individual role be identified. *See Southland*, 365 F.3d at 365. These allegations present the same group pleading concern as the slide deck attribution, though, like the dinner meeting, to the extent the conjunctive attribution reflects conduct in which both defendants actually and jointly participated, the *VeroBlue Farms* qualification applies.

#### 2. *Puzzle Pleading and Rule 10(c)*

The Defendants argue that the Complaint constitutes impermissible "puzzle pleading"—that the Claims for Relief section contains nothing beyond formulaic element recitations, and that requiring the Court to cross-reference the Factual Background to reconstruct the factual predicate is itself a pleading defect. *See N. Port Firefighters—Loc. Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 739 (N.D. Tex. 2013).

The Court does not find that the Complaint crosses this line. Rule 10(c) expressly provides that "a statement in a pleading may be adopted by reference elsewhere in the same pleading." FED. R. CIV. P. 10(c). The Court must consider the complaint as a whole. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007); *U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 321 (5th Cir. 2016). A complaint that states its factual allegations in a background section and expressly incorporates them by reference into each count does not constitute puzzle pleading merely because the claim-specific paragraphs are concise. Puzzle pleading is a concern where the background is vague and disorganized. The Factual Background at hand identifies specific

23

speakers, dates, forms of communication, and representations. The Claims for Relief section incorporates those allegations and asserts the legal theories under which they are actionable. That structure is permissible. Therefore, the Motion to Dismiss all Counts on puzzle pleading grounds is DENIED.

### 3. *Information and Belief Allegations as to Hafer*

Several of the Complaint's allegations connecting Hafer to the events of January 2024 are pled "based on information and belief," specifically that Rochon and Hafer were copied on the Levy and Lau email chains regarding the stop loss.[84] Rule 9(b) does not permit fraud allegations to rest on "information and belief" without a corresponding statement of the factual basis for that belief. *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 358 n.104 (5th Cir. 2002). The Complaint states only that Hafer received the emails "based on information and belief" without identifying what factual circumstances supports that belief beyond her role as a corporate officer of RCP VII's general partner. That basis is insufficient to satisfy Rule 9(b). This finding is reflected below in the count-specific dispositions—the Court declines to rely on these allegations as independently establishing Hafer's knowledge of or participation in the alleged fraud for purposes of any count.

## C. Agency and Intermediary Fraud

Having determined that the Complaint's allegations regarding Gross's individual communications satisfy Rule 9(b)'s particularity requirements as to the identity of the speaker, the date, the form, and the content of each representation, the Court turns to the threshold question of whether those allegations are sufficient to hold the Defendants liable for statements they did not personally make. Because nearly all of the pre-investment representations attributed to non-party

---

[84] ECF No. 13 at 10–11.

24

Gross form the factual nucleus of Counts I through IV, whether the Complaint adequately connects those representations to the Defendants is among the most consequential pleading questions in this case.

The Plaintiffs advance two theories under which Gross's representations may be attributed to the Defendants. The first is actual agency—that Gross acted as the Rochons' agent with actual authority, such that his representations are attributable to the Rochons under ordinary principles of agency law. The second is intermediary fraud under the "reason-to-expect" standard of *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*—that even absent a formally established agency relationship, the Rochons are liable because they had "especial reason" to expect that Gross' representations would reach and influence the Boeckman Parties. 51 S.W.3d 573 (Tex. 2001). The Court addresses each theory in turn.

### 1. Actual Agency

Under Texas law, "[a]gency is the consensual relationship between two parties when one, the agent, acts on behalf of the other, the principal, and is subject to the principal's control." *Indian Harbor Ins. Co. v. Valley Forge Ins. Grp.*, 535 F.3d 359, 364 (5th Cir. 2008) (citing *Happy Indus. Corp. v. Am. Specialties, Inc.*, 983 S.W.2d 844, 852 (Tex. App.—Corpus Christi 1998, pet. dism'd w.o.j.)). To adequately plead that an agency relationship exists, the Plaintiffs must plead that: (1) the principal had control over the agent, and (2) both parties consented to the agent acting on behalf of the principal. *Id.* "It is the principal's extent of control over the details of accomplishing the assigned task that primarily distinguishes the status of independent contractor from that of agent." *Id.*

A principal can be held liable for the conduct of an agent committed within the scope of the agent's authority. *See Protect Env't Servs. v. Norco Corp.*, 403 S.W.3d 532, 540 (Tex. App.—

El Paso 2013). Actual authority, either express or implied, exists when the principal: (1) intentionally gives the agent that authority, (2) intentionally allows the agent to believe he has it, or (3) through a lack of due care, leads the agent to believe he has it. *Id.* Actual authority arises from the principal's written or spoken words, or from the principal's conduct communicated to the purported agent. *Id.* "An agency relationship based on actual authority may be implied through the conduct of either of the parties or from the facts and circumstances surrounding the transaction in question." *Id.* (citing *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549–50 (Tex. App.—Houston [14th Dist.] 2003)). Thus, actual authority may be established through allegations that the principal intentionally granted another the authority to act on its behalf, or that the principal—whether intentionally or through lack of due care—led the other person to believe the agent possessed such authority. *Id.*

At the pleading stage, a plaintiff need not produce a formal agency agreement. *See Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 642 (S.D. Tex. 2016) ("[W]hen certain information is peculiarly within defendants' knowledge, the courts are more forgiving") (quoting *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2002 WL 32107216, at *11 (S.D. Tex. Aug. 12, 2002)). It suffices to allege facts from which a reasonable inference of agency can be drawn. *Id.* However, where an agency claim sounds in fraud, Rule 9(b) requires that the factual basis for the agency relationship be pled with some particularity—a conclusory assertion of agency alone will not suffice. *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. CIV.A. H-06-1492, 2007 WL 400094, at *3 (S.D. Tex. Feb 1, 2007); *Setliff v. Zoccam Techs., Inc.*, No. 3:21-CV-2025-B, 2022 WL 504395, at *14 (N.D. Tex. Feb. 18, 2022) (dismissing agency-based fraud claims for failure to plead with particularity as required by Rule 9(b)).

At the same time, the Court is mindful that where information necessary to plead the mechanics of the agency relationship lies exclusively within the defendants' control, courts are "more forgiving in applying Rule 9(b), finding that less detail is required in such cases." *Benhamou*, 190 F. Supp. 3d at 642; *see also Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990). The precise terms, scope, and mechanics of the Rochons' arrangement with Gross are, by their nature, matters within the Defendants' knowledge rather than the Plaintiffs'. The Court therefore evaluates the agency allegations with that asymmetry in mind.

The Plaintiffs' primary agency allegation is that "[i]n all of his communications with Boeckman, Gross acted on the directions of Rochon and Rochon Jr."[85] The Plaintiffs reiterate this allegation in the context of the November 2021 communications, describing Gross as "acting at the direction of the Rochons."[86] Similarly, the Plaintiffs refer to Gross as "the Rochons' initial agent."[87]

Defendants argue that these allegations amount to nothing more than naked assertions of agency indistinguishable from those found deficient in *Whitney* and *Setliff*. In *Whitney*, the court dismissed agency-based fraud claims where a plaintiff alleged only that the defendant bank had instructed a third party to deliver fraudulent loan documents, finding no allegation "that Whitney Bank took an action or failed to take an action that would lead a reasonably prudent person to believe it had authorized [the third party] to act on Whitney Bank's behalf," and noting that alleged apparent authority was the "only basis" for fraud liability against the bank. *Whitney*, 2007 WL 400094, at *4–5. In *Setliff*, the court similarly dismissed agency based claims where the complaint alleged only that defendants "provided [the agent] with instructions," characterized that assertion

---

[85] ECF No. 13 at 4.
[86] *Id.* at 6.
[87] *Id.* at 12.

as a "mere naked assertion," and noted that the complaint's contradictory allegations about the agent's relationships with multiple defendants left them "without notice as to who had direct influence or control" over the agent at any given time. *Setliff*, 2022 WL 504395, at *14.

The "directions allegations," on their own, would present a similar problem. It does not identify what directions were given, by whom specifically, when, in what form, or what their substantive content was. Standing alone, it would not satisfy Rule 9(b)'s particularity requirement for the agency relationship. The critical distinction, however, is that the "directions" allegation does not stand alone in the instant case.

The Plaintiffs' allegations differ from both *Whitney* and *Setliff* in the respects that were significant to those courts. In *Whitney*, the plaintiff's entire theory of agency rested on a single act—the delivery of the documents—and alleged apparent authority was the "only basis" for fraud liability against the defendant bank. *Whitney*, 2007 WL 400094, at *5. Here, the agency theory is not the only basis for liability against the Rochons—the Complaint independently alleges that the Rochons personally made the same misrepresentations at the January 2022 dinner meeting and personally directed the stop loss manipulation—and the contextual allegations supporting agency go well beyond a single act of document delivery.

In *Setliff*, the court's stated concern was the complaint's contradictory and overlapping allegations about which defendant exercised control over the agent at which point in time, leaving all defendants without fair notice. *Setliff*, 2022 WL 504395, at *14. No such contradiction exists here. The Plaintiffs unambiguously allege that Gross acted at the direction of the Rochons throughout his communications with Boeckman, without any competing or inconsistent allegations about alternative principals or shifting authority relationships.

Beyond the bare "directions" allegation, the Plaintiffs provide several contextual facts in the Complaint that, taken together and accepted as true, support a plausible inference of actual agency with sufficient particularity to survive dismissal. First, Gross communicated with Boeckman using an email account bearing the domain "@richmont.net" and a signature identifying him as an employee of "Richmont Holdings," with a hyperlink redirecting recipients to the website of Richmont Capital Partners, on which both Rochon and Rochon Jr. appeared as management team members. The use of a principal's proprietary domain, brand, and web presence to solicit investments is not the act of an independent contractor operating on his own account. It is conduct that, absent authorization, would likely expose Gross to independent liability. A logical inference from these allegations is that the Rochons authorized Gross to operate under the Richmont brand in soliciting investments on their behalf. *See Sanders Oil & Gas GP, LLC v. Ridgeway Elec.*, 479 S.W.3d 293, 299–303 (Tex. App.—El Paso 2015).

Second, the written presentation Gross provided to Boeckman on June 17, 2021 identified Rochon himself as a principal of Rally. Gross's specific identification of Rochon by name as a fund principal in a document Gross transmitted is a detail that is plausibly indicates some degree of coordination and authorization. It is reasonable to infer that a person marketing an investment fund does not unilaterally attribute fund ownership to a named individual without that individual's knowledge and consent—much less the individual he is alleged to be an agent for. Especially when the alleged principal parrots the same representations and attributes of the fund. The Court therefore infers for purposes of the Motion to Dismiss that Rochon authorized this identification, at best, and was aware of the inclusion, at worst, thereby, supporting the broader inference that Rochon authorized the solicitation campaign in which it appeared.

29

Third, and most significantly, the Plaintiffs allege that at the January 2022 dinner meeting, the Rochons personally "repeated the representations made by Gross and in the written materials provided by Gross."[88] A principal who personally attends a solicitation meeting with a prospective investor and repeats—allegedly with substantial specificity—the same representations his purported agent had been making for months demonstrates both awareness of those representations and affirmative adoption of them. The Defendants seem to argue that the Court should view it as pure happenstance that the Rochons invited Boeckman to dinner and repeated the same representations that Gross had been making from June to November. The Court finds this argument unpersuasive. Rather, this conduct is logically understood as ratification of Gross's prior representations, if not confirmation of prior authorization. Under Texas agency law, ratification arises when a principal, with knowledge of the agent's acts, affirms those acts either expressly or by conduct inconsistent with another interpretation. *See Land Title Co. of Dallas v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 756–57 (Tex. 1980). Whether characterized as prior authorization or subsequent ratification, either is sufficient to establish an agency relationship for purposes of liability. *Id.*

The Court finds particularly probative the alleged near-verbatim correspondence between the representations Gross made in his individual pre-investment communications and those the Rochons personally delivered at the January 2022 dinner.[89] The Plaintiffs allege that Gross represented, among other things, that Rally comprised artificial intelligence and machine learning technology, that the fund was highly liquid with redemption available within five days, that returns averaged 2% per month, and that no trade had ever been lost.[90] The Plaintiffs go on to allege that

---

[88] ECF No. 13 at 6.
[89] ECF No. 13 at 6.
[90] *Id.*

at the dinner, the Rochons "stated that Rally was comprised of artificial intelligence and machine learning," "repeated the representations previously made by Gross and in the written materials provided by Gross," and "continued to pitch the liquidity of the fund, permitting investors to liquidate funds in as little as five days."[91] This mirroring of representations provides circumstantial evidence of actual authority that, combined with the Richmont branding and Rochon's identification as a fund principal in Gross's materials, is sufficient at the pleading stage to establish a factual basis for the agency theory that goes sufficiently beyond bare assertions. *See Enron Corp. Secs., Derivative & ERISA Litig.*, 762 F. Supp. 2d 942, 971 (S.D. Tex. 2010) (permitting inference of coordinated conduct from circumstantial evidence).

The Court's finding that the Plaintiffs adequately pleaded an actual agency relationship has a direct consequence for the governing legal standard. If Gross acted as the Rochons' actual agent with authority to solicit investments and make representations on their behalf, as alleged, the Rochons' liability for his representations does not require independent satisfaction of the *Ernst & Young* "especial likelihood" standard. That framework governs liability for misrepresentations conveyed through third parties who are not in privity with one another. *See Ernst & Young*, 51 S.W.3d at 580. Where actual agency exists, liability follows from the agency under ordinary respondeat superior principles, not from the defendant's foresight about whether the agent's statements would reach a particular plaintiff. *See Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 947.

The Court therefore finds that, to the extent the Complaint adequately alleges an actual agency relationship between the Rochons and Gross—which for the reasons set forth above, it does—the *Ernst & Young* intermediary fraud standard does not independently govern the analysis of Rochons' liability for Gross's direct communications with Boeckman.

---

[91] *Id.*

31

## 2. *Intermediary Fraud Under Ernst & Young*

Notwithstanding the foregoing, the Court addresses the *Ernst & Young* framework as an alternative basis for the same conclusion, and because that framework independently governs the more challenging question of the Rochons' liability as to those Boeckman Parties who did not directly receive Gross's representations and whose investments depended on Boeckman's personal relay of those representations.

In *Ernst & Young*, the Supreme Court of Texas addressed the circumstances under which a defendant may be held liable for misrepresentations conveyed through a third-party intermediary to the ultimate plaintiff. The court adopted the "reason-to-expect" standard from the Restatement (Second) of Torts, holding that "a person who made a misrepresentation is liable to the person or class of persons the maker intends or 'has reason to expect' will act in reliance upon the misrepresentation," and that "a defendant who acts with knowledge that a result will follow is considered to intend the result." *Ernst & Young*, 51 S.W.3d at 578–79. This standard requires a "degree of certainty that goes beyond mere foreseeability" in order to "foreclose the potential for unlimited liability." *Id.* at 579–80. Specifically, the defendants must have had "information that would lead a reasonable man to conclude that there is an especial likelihood" that the misrepresentation would reach those persons and influence their conduct. *Id.* at 580; *see also Enron Corp. Secs.*, 762 F. Supp. 2d at 1021.

While intent may be alleged generally under Rule 9(b), that general-pleading principle does not authorize naked conclusory assertions of intent untethered from any factual support. *See Dorsey*, 540 F.3d at 339. The requisite intent must be supported by specific facts from which the especial likelihood of transmission and reliance can be plausibly inferred. *Id.*; *Ernst & Young*, 51 S.W.3d at 579–80.

32

As to Boeckman's direct reliance on Gross's representations, the Court finds that the *Ernst & Young* standard is satisfied independently of the agency analysis. The same contextual facts that support the inference of actual agency equally and independently support the inference that the Rochons had especial reason to expect that Gross's representations would reach Boeckman and influence his investment decisions.

Critically, the Plaintiffs allege that the solicitation was not a generalized marketing campaign directed at an indeterminate class of investors.[92] Rather, Gross directed his communications specifically to Boeckman, using materials that identified Rochon by name as a fund principal and that linked Boeckman directly to Richmont Holdings website.[93] The Court finds it reasonable to believe that a defendant who directs a targeted agent to solicit a specific individual with specific representations, does so with an especial likelihood of expecting that those representations will reach and influence that individual. *Ernst & Young*, 51 S.W.3d at 578–80; *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1202, 1209 (S.D. Tex. 2009) (citing *Matis v. Golden*, 228 S.W.3d 301, 310 (Tex. App.—Waco 2007, no pet.) (holding that the plaintiffs sufficiently alleged reliance where the defendants "were not merely relaying information, but their representations were made with special knowledge … [based on their] access to unique information regarding the investment process")). The *Ernst & Young* standard is therefore satisfied as it relates to Boeckman in the Complaint. 51 S.W.3d at 578–80.

The more challenging application of the *Ernst & Young* standard arises with respect to those Boeckman Parties who did not receive Gross's communications or attend the January 2022 dinner. For those plaintiffs—Howd and Elizabeth M. Boeckman—the chain of intermediaries extends from the Rochons to Gross to Boeckman, and then from Boeckman to his family members.

---

[92] *See generally* ECF No. 13.
[93] *Id.* at 4–5.

Satisfying the *Ernst & Young* standard as to these plaintiffs requires the inference that the Rochons had especial reason to expect not only that Gross's representations would reach Boeckman, but also that Boeckman would relay those representations to family members who would independently rely on them in making investment decisions. *Ernst & Young*, 51 S.W.3d at 578–80. This two-step chain presents a materially different and more demanding application of the especial likelihood standard than the direct solicitation of Boeckman himself.

Plainly, the Plaintiffs do not adequately allege facts sufficient to satisfy the *Ernst & Young* standard at this second link in the chain. The primary allegation on which the Plaintiffs rely for this purpose is that each of the January 2022 investments were made "in response to the specific solicitations made by Gross, Rochon, Rochon Jr. and others acting on their behalf to Boeckman."[94] That allegation, however, frames the solicitation as directed at Boeckman, not at his family members. It therefore speaks to Boeckman's reliance, not to the Rochons' awareness that Boeckman would serve as a conduit through whom their representations would reach and influence independent investment decisions by other individuals. As the Fifth Circuit has recognized, an allegation that a plaintiff relied on a defendant's misrepresentations goes to the element of reliance, not to the separate element of causation or, in the intermediary fraud context, to the defendant's reason to expect that the misrepresentation would reach a particular third—in this case fourth—party. *Hoffman v. L & M Arts*, 838 F.3d 568, 578 (5th Cir. 2016) (quoting *Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.*, 444 Fed.Appx. 1, 10–11 (5th Cir. 2011)).

The arrangement of a second Zoom meeting attended by Boeckman's sister is similarly insufficient to carry the weight the Plaintiffs assign to it. The Plaintiffs do not allege that the Rochons arranged that meeting, that they were aware of Howd's attendance, or that they

---

[94] ECF No. 13 at 7.

34

specifically contemplated and expected that her participation would translate into an independent investment decision by her or by the trust of which she was a trustee. The meeting was arranged by Gross, and its participants—Gross, Levy, Lau, Boeckman, and Howd—do not include any of the Defendants. The Court cannot infer from Gross's arrangement of a Zoom meeting that the Rochons specifically anticipated Boeckman would relay their representations to other family members who would separately invest. Such an inference would rest on speculation rather than on well-pleaded facts, and the *Ernst & Young* standard requires something more certain than speculation to establish especial likelihood. *Ernst & Young*, 51 S.W.3d at 579–80.

The *Ernst & Young* framework is intended to prevent the extension of fraud liability along unlimited chains of transmission by requiring a degree of certainty about the defendant's reasonable expectations that goes beyond mere foreseeability. *Id.* at 579. Applying that standard here, the Court finds that the Complaint does not allege facts sufficient to establish that the Rochons had especial reason to expect that their representations to Boeckman would travel a second step to independently influence the investment decisions of his family members. The intermediary fraud theory therefore fails as to those plaintiffs who did not directly receive the Rochons' or Gross's representations.

Accordingly, whether each Plaintiffs' claim is based upon intermediary fraud or independent grounds requires a detailed review of the facts as alleged. Beginning with independent grounds, only Boeckman can independently ground any claims based on direct representations made by the Rochons at the January 2022 dinner. Boeckman, not his family members, was the intended audience. The February 2023 slide deck was transmitted to Boeckman and Howd directly; therefore, as a general matter, Boeckman and Howd's claims are independently grounded in any representations made in the February 2023 slide deck. The intermediary fraud theory as applied to

35

Gross's representations to Boeckman *as a relay to the family members* is, however, insufficiently pled in the Complaint and is dismissed on that basis, with leave to amend.

The Plaintiffs whose claims rest on intermediary fraud do not all stand in the same position. Several Plaintiffs invested not in their individual capacities, but through Boeckman acting as Trustee or manager. As to those Plaintiffs, Boeckman himself was the direct recipient of the representations at issue. A claim grounded in Boeckman's direct receipt of and reliance upon those representations in his fiduciary capacity is a direct reliance claim, not an intermediary fraud claim. It does not require the inference that the Rochons had especial reason to expect that Boeckman would relay their representations to independent third parties. Therefore, the claims of the Daniel Trust, the K. Boeckman Irrevocable Trust, and BCE therefore survive to the same extent as Boeckman's individual claims.

Howd's claims present a different issue. She did not attend the January 2022 dinner, and the Court cannot infer that representations made to Boeckman at a meeting she did not attend were made directly to her. Her direct theory rests on the February 2023 slide deck, which allegedly was transmitted to both Boeckman and Howd. However, her only investment was made *prior* to her receipt thereof. Therefore, the Motion to Dismiss is GRANTED as to Howd as to all claims without prejudice, with leave to amend.

Similarly, E. Boeckman is alleged to have invested $50,000 on January 11, 2022, but the Plaintiffs do not allege that she attended the January 2022 dinner, received the slide deck, attended either Zoom meeting, or had any direct contact with the Defendants. In fact, her name is notably absent from almost the entirety of the Complaint, including the opening paragraph that details the parties to the adversary proceeding. The only specific reference to E. Boeckman outside of the caption is provided in paragraph 20 where it is alleged that she invested $50,000 in Rally, and that

36

this investment was "made in response to the specific solicitations made by Gross, Rochon, Rochon Jr. and other acting on their behalf to *Boeckman*."[95] Her claims rest entirely on the intermediary fraud theory, that Boeckman relayed the Rochons' representations to her and that she relied on them in deciding to invest. That is precisely the theory that the Court has found insufficiently pled. As such, E. Boeckman's claims fail on both the direct agency theory and the intermediary fraud theory. Therefore, the Motion to Dismiss is GRANTED as to all of E. Boeckman's claims without prejudice, with leave to amend..

### D.  Opinions, Projections, and Actionable Statements of Fact

The Defendants contend that many of the representations identified in the Complaint are non-actionable opinions or forward-looking projections rather than statements of existing or historical fact, and that the Complaint therefore fails to allege actionable misrepresentations capable of supporting the fraud-based counts. The Court addresses this argument by first setting out the legal standard, then categorizing the specific representations at issue, before reaching its conclusion on this ground for dismissal.

Not every false statement gives rise to a claim for fraud. Under Texas law, a representation of fact is actionable only if it "admits of being adjudged true or false in a way that admits of empirical verification." *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986). Pure expressions of opinion—statements that reflect a speaker's subjective belief or judgment rather than an objective fact—are not representations of material fact and therefore cannot provide the basis for a fraud claim. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337–38 (Tex. 2011). Similarly, predictions or projections of future performance are generally non-actionable because "[a] prediction, or statement about the future,

---

[95] ECF No. 13 at 7.

is essentially an expression of an opinion." *Presidio Enters.*, 784 F.2d at 679–80. This rule applies with particular force to predictions about investment returns, which courts have consistently treated as forward-looking expressions of expectation rather than statements of then-existing fact. *See E.R. Dupuis Concrete Co. v. Penn Mut. Life Ins. Co.*, 137 S.W.3d 311, 321 (Tex. App.—Beaumont 2004) (affirming dismissal of fraud claim based on predictions of future investment performance not shown to be known as false when made); *Patel v. Pac. Life Ins. Co.*, No. 3:08-CV-249-B, 2011 WL 817478, at *3–4 (N.D. Tex. Mar. 8, 2011).

However, the opinion and projection shield has well-defined limits. A statement of opinion may constitute actionable fraud if the speaker had actual knowledge of its falsity at the time it was made. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983) (citations omitted). Likewise, a prediction of future performance may be actionable if the plaintiff adequately alleges that the defendant knew the prediction to be false when stated—for example, where the defendant possessed information at the time of the statement that made the projected outcome impossible or highly unlikely. *See E.R. Dupuis Concrete Co.*, 137 S.W.3d at 321; *Patel v. Pac. Life Ins. Co.*, 2011 WL 817478 at *3–4.

Most significantly for purposes of this Motion, the opinion and projection defense does not extend to representations about then-existing or historical facts, such as those statements that describe the current state of affairs, the historical performance of an investment, or the present attributes of a fund or platform as they exist at the time of the statement. *See E.R. Dupuis Concrete Co.*, 137 S.W.3d at 321; *Patel v. Pac. Life Ins. Co.*, 2011 WL 817478 at *3–4. Such representations are statements of fact susceptible to objective verification, not predictions about what may occur in the future, and they are actionable if false regardless of whether they are embedded in a broader solicitation that also contains projections. *See Presidio Enters.*, 784 F.2d at 680.

38

With these principles in mind, the Court turns to the specific representations alleged in the Complaint, which fall into three analytically distinct categories: (1) representations about Rally's historical track record and past performance; (2) representations about the then-existing nature and structure of the investment platform; and (3) representations about future and projected returns.

### 1.   *Representations About Rally's Historical Track Record and Past Performance*

The Plaintiffs allege that Gross and the Rochons represented, on multiple occasions and through multiple forms of communication, that Rally had "never had a down month," that the algorithm "had not lost a trade," that the fund had experienced "only one losing trade in fifteen months," and that the December 2022 slide deck represented that "the algorithm has never made a losing trade."[96] These are not predictions about what Rally might achieve in the future. They are affirmative representations about what Rally had already done—statements about historical performance that describe a factual track record susceptible to objective verification. A statement that a fund has never lost a trade either is or is not true; it is subject to empirical verification in precisely the manner the law requires for a statement to be actionable. *Presidio Enters.*, 784 F.2d at 679.

The Defendants' opinion and projection argument has no application to these representations. Whether Rally's historical trading record was as described is not a matter of opinion or prediction, it is a question of historical fact. If the representations were false when made, and if the speakers knew or recklessly disregarded their falsity, they are fully actionable under Texas law. *See id.*; *see also E.R. Dupuis Concrete Co.*, 137 S.W.3d at 321. The Complaint's later allegations—that Levy and Lau informed the Rochons that the platform was not algorithmic or robotic, and that the stop loss was manually overridden on multiple occasions—plausibly supports

---

[96] ECF No. 13 at 4–8.

the inference that the historical track record representations were false, and that the Defendants had information suggesting their falsity at the time the representations were made or continued to be made. The Motion to Dismiss on opinion and projections grounds is DENIED as to the historical track record representations.

### 2. Representations About Then-Existing Nature and Structure of the Investment Platform

The bulk of the representations alleged in the Complaint concern not projected future performance but the then-existing nature, structure, ownership, and risk controls of the Rally platform itself. The Court finds this category of representations to be the most clearly actionable, and the opinion and projection defense to be at its weakest.

The Complaint alleges that the Defendants represented that Rally was "a proprietary artificial intelligence and machine learning platform owned and operated under Richmont Capital Partners" and that the December 2022 slide deck further represented RCP VII as the owner and operator of the platform.[97] These are statements about a then-existing legal and operational fact—who owned the platform at the time of the representation. Either RCP VII owned the platform or it did not. The Complaint alleges that RCP VII did not own Rally, but rather that the platform was in fact owned by Royal Algo, Ltd. and licensed through Jameson Asset Management International, with RCP VII holding only a non-exclusive sub-license.[98] A representation about existing ownership of an asset is not an opinion or a projection. It is a statement of fact that admits of empirical verification, and it is actionable if false. *See Presidio Enters.*, 784 F.2d at 679–80.

The Plaintiffs also allege that Gross and the Rochons represented that "the entire investment cycle is algorithmic and robotic," that Rally's trading decisions were free from human

---

[97] ECF No. 13 at 4–8.
[98] *Id.* at 12.

intervention, and that the algorithm alone determined when to enter and exit trades.[99] These representations describe the then-existing operational structure of the platform—how it actually functioned at the time of the statements. They are not predictions about how the platform might function in the future; they are present-tense descriptions of the platform's existing design and operation. A representation that a trading system is fully automated and free from human intervention either accurately describes its design or it does not. The Complaint alleges that it did not—that the stop loss was subject to human override at Rochon Jr.'s discretion, as demonstrated by his January 2024 directive to move the stop loss to 5,150.[100] This is an objective, verifiable fact about the platform's existing structure, not an expression of opinion or a projection of future behavior. The opinion and projection argument has no application to this category of representations.

Gross and the Rochons are alleged to have represented on multiple occasions that each trade carried a "2% stop loss," that no single trade would exceed "2% of investors overall account," and that "7 levels of stop loss" protected the fund from significant losses.[101] These representations describe the then-existing risk controls governing the investment—how the fund was structured to limit losses at the time of the statements. They are present-tense representations about the existing operational parameters of the fund, not predictions about future market conditions or expected returns. Either the fund maintained a 2% stop loss discipline as described or it did not. The Plaintiffs allege that it did not and that Rochon Jr. manually moved the stop loss, without investor consent, first to 5,150 and then higher, exposing the Boeckman Parties to losses far in excess of

---

[99] ECF No. 13 at 4–6.
[100] Id. at 10.
[101] Id. at 4–6.

2% of their invested funds.[102] These representations are statements of existing fact, susceptible to empirical verification, and fully actionable if false. *Presidio Enters.*, 784 F.2d at 679.

The Plaintiffs allege that the fund was represented to be "100% liquid" and that investors could "liquidate funds in as little as five days."[103] To the extent these representations describe the then-existing terms and structure of the investment—the actual redemption mechanics available to investors under the fund's governing documents at the time of the statements—they are representations of then-existing fact rather than projections of future liquidity conditions. The Plaintiffs' allegations that withdrawal requests made in December 2023 were refused and that the fund was unable to liquidate positions on short notice suggest that the represented liquidity terms did not reflect the investment's actual structure, supporting the inference that the liquidity representations were false when made. The Court finds that these representations are sufficiently characterized as statements of then-existing fact to survive the opinion and projection defense at the pleading stage.

### 3. *Representations About Future and Projected Returns*

The Court's analysis is more nuanced with respect to the representations about projected investment returns. Gross and the Rochons represented that the fund "averages 2% per month" was "averaging 24% per year, net of fees," and had "historically returned 4–5% per month before fees."[104] The Defendants argue that these return projections are quintessential forward-looking statements that are non-actionable absent a specific allegation that the speakers knew them to be false when made. The Court finds this argument partially persuasive.

---

[102] *Id.* at 10.
[103] ECF No. 13 at 6.
[104] *Id.* at 4–6.

First, as framed in the Complaint, at least some of these return representations are presented not as projections of future performance but as descriptions of the fund's historical average returns—statements about what the fund had earned in the past, not what it was expected to earn in the future. The representation that the fund was "averaging 24% per year, net of fees" or "had historically returned 4-5% per month before fees" describes a historical track record rather than a prediction of future results. To the extent these representations characterize past performance rather than project future returns, they fall within the category of actionable historical fact representations addressed above, not within the category of non-actionable projections. *See Presidio Enters.*, 784 F.2d 679–81.

Second, even to the extent any return representations are properly characterized as forward-looking projections, the opinion and projection defense does not automatically foreclose liability if the speaker knew the projection to be false when made. *See Trenholm*, 646 S.W.2d at 930. The Plaintiffs' allegations—that the platform was not algorithmic or robotic as represented, that the stop loss mechanism was subject to human override, and that the defendants deployed investor funds in a concentrated S&P 500 short position rather than a diversified, low-risk currency pair strategy—collectively support the inference that the Defendants possessed the information at the time of the return projections that made those projections implausible, if not impossible, on the terms represented. *See id.*; *Presidio Enters.*, 784 F.2d 679–81. Whether those circumstances are sufficient to establish that the Defendants knew the projections to be false when made is a question that depends on facts not fully developed at the pleading stage. At the Rule 12(b)(6) stage, where all well-pleaded allegations are accepted as true and all reasonable inferences are viewed in the Plaintiffs' favor, the Court finds that the Complaint adequately alleges the predicate facts from

43

which knowing falsity of even the forward-looking return representations can be plausibly inferred. *See Presidio Enters.*, 784 F.2d 679–81.

Therefore, the Motion to Dismiss the fraud-based counts on the ground that the return representations are non-actionable projections is DENIED.

### E. Proximate Causation

The Defendants move to dismiss all counts on the independent ground that the Plaintiffs fail to adequately plead proximate causation. Specifically, the Defendants contend that the Plaintiffs' allegations go only to the element of reliance—that the Boeckman Parties would not have invested but-for the Defendants' representations—without separately and adequately alleging that the *falsity* of those representations caused the losses the Boeckman Parties sustained. Because proximate causation is a required element of each fraud-based count, the Defendants argue that this deficiency alone warrants dismissal of the Complaint in its entirety.

To prevail on a common law fraud claim in Texas, a plaintiff must show not only that it relied on the defendant's misrepresentations, but also that those misrepresentations caused the plaintiff's injury. *Ratner v. Sioux Nat. Gas Corp.*, 770 F.2d 512, 519 (5th Cir. 1985). This requirement distinguishes the element of reliance from the separate element of loss causation. As the Fifth Circuit explained in *Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.*,

> it is not sufficient to show that [the plaintiff] would not have entered into the agreement if [the defendant] had not made the alleged misrepresentation or nondisclosures; that allegation goes to the element of reliance. Rather, [the plaintiff] must show that [the defendant's] misrepresentations or nondisclosures *caused* the injury [the plaintiff] suffered.

444 Fed. Appx. 1, 10–11 (5th Cir. 2011) (emphasis added). In other words, the plaintiff must plead and ultimately prove "a pecuniary loss suffered which is directly traceable to and which resulted from the false representations upon which the injured party relied." *Pasture Renovators, L.L.C. v. Lawson Cattle & Equip., Inc.*, 480 F. Supp. 2d 890, 893–94 (W.D. Tex. 2006) (quoting *C & C*

44

*Partners v. Sun Expl. and Prod. Co.*, 783 S.W.2d 707, 718–19 (Tex. App.—Dallas 1989, writ denied)).

Significantly, while fraud-based claims are subject to Rule 9(b)'s heightened pleading standard, causation is not subject to Rule 9(b) but instead need only satisfy the more permissive requirements of Rule 8(a). *N. Port Firefighters' Pension—Loc. Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 761 (N.D. Tex. 2013). Under Texas law, causation is typically a question of fact. Courts generally disfavor dismissal for failure to plead proximate causation. *See Off. Stanford Invs. Comm. v. Breazeale Sachse & Wilson LLP*, Case No. 3:11-CV-0329-N, 2015 WL 13740747 (N.D. Tex. Mar. 24, 2015); *Troice v. Proskauer Rose LLP*, Case No. 3:09-CV-1600-N, 2015 WL 1219522, at *9 (N.D. Tex. March 4, 2015), *rev'd on other grounds*, 816 F.3d 341 (5th Cir. 2016). With these principles in mind, the Court evaluates whether the Plaintiffs adequately plead the causal connection between the Defendants' alleged misrepresentations and the Boeckman Parties' losses.

The Defendants are correct that several of the Plaintiffs' key allegations are framed in the language of reliance rather than causation. The allegation that each investment was made "in response to the specific solicitations" of Gross and the Rochons, standing alone, describes why the Boeckman Parties invested, not why the falsity of those representations caused the loss that ultimately materialized. *See Hoffman*, 838 F.3d at 578 (citing *Blue Gordon, C.V.*, 444 Fed. Appx. at 10–11).

The Complaint is not, however, limited to reliance allegations. A fair reading of the pleading as a whole reveals a specific and plausible causal theory connecting the falsity of the Defendants' representations directly to the losses incurred. The Plaintiffs expressly allege that the misrepresentations "proximately caused" the Boeckman Parties' financial loss, that the specific

45

representations in the February 2023 slide deck "caused Boeckman to invest additional monies," and that the investments were made "principally because of the safety and liquidity attributes represented" by the Defendants. These allegations identify not merely the Boeckman Parties' reliance on the representations but connect the specific falsity of those representations to the decision to invest and their ultimately to the loss.

The Plaintiffs allege a specific causal connection of the falsity of the representations to the magnitude of the loss actually sustained. The alleged representations that the trading platform was algorithmic and robotic and that each trade utilized a 2% stop loss were false because the stop loss was subject to human override. Rochon Jr. is alleged to have exercised that override without investor consent, moving the stop loss to 5,150 and then higher, thereby eliminating the protection those representations had promised. The Plaintiffs allege that had the stop loss been maintained as represented, the trade would have closed with a controlled and limited loss rather than the catastrophic outcome that resulted.[105] That allegation directly and specifically connects the falsity of a particular representation—that a 2% stop loss would govern each trade—to the magnitude of the harm, satisfying the loss causation requirement. *Hoffman*, 838 F.3d at 578. This is not a but for reliance theory; it is an allegation that the specific falsity of a specific representation was directly instantiated in the management of the investment in a manner that caused the loss.

The Defendants argue separately that the Zoom meetings arranged by Gross constituted an intervening event disconnecting the Rochons' earlier representations from the subsequent BCE and Duncan Trust investments. An intervening cause sufficient to break the chain of proximate causation must be independent of and unforeseeable from the original tortious conduct. *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). The Zoom meetings were

---

[105] ECF No. 13 at 13.

46

neither. They were allegedly arranged by Gross, acting as the Rochons' agent, for the express purpose of further explaining the same platform to the same prospective investors he had been soliciting on the Rochons' behalf. They were a foreseeable continuation of the Rochons' solicitation campaign, not an intervening event. Moreover, the Complaint attributes the subsequent additional investments not to the Zoom meetings alone but to "the Rochons' representations and the continued marketing efforts of Gross and the Rochons."[106]

Therefore, the Motion to Dismiss all Counts on proximate causation grounds is DENIED.

## V.   COUNT-SPECIFIC ANALYSIS

### A. Counts I and II — Negligent Misrepresentation and Common Law Fraud

Counts I and II allege, respectively, negligent misrepresentation and common law fraud arising from the same nucleus of alleged misrepresentations and omissions. Because both counts rest on the same factual predicate and are governed by the same cross-cutting findings discussed in the Court's analysis above, the Court addresses them together before turning to the one issue that distinguishes them—the heightened scienter requirement of Count II—and the claims against Hafer.

Negligent misrepresentation under Texas law requires: (1) a representation of false information made by a defendant in the course of its business or in a transaction in which the defendant has a pecuniary interest; (2) the defendant's failure to exercise reasonable care in obtaining or communicating the information; (3) the plaintiff's justifiable reliance on the representation; and (4) resulting financial loss. *Fed. Land Bank Ass'n of Tyer v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). Unlike common law fraud, negligent misrepresentation does not require the plaintiff to show that the defendant knew the representation was false when made—it requires only

---

[106] ECF No. 13 at 7–8.

that the defendant failed to exercise reasonable care. *Id.*; *compare Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd v. Potter*, 607 F.3d 1029, 1032–33 (5th Cir. 2010). However, because the Plaintiffs' claim for negligent misrepresentation is comprised of the same nucleus of alleged misrepresentations underlying all six counts, including the common-law-fraud claim, it is subject to Rule 9(b)'s heightened pleading standard.

Common law fraud under Texas law requires: (1) a material misrepresentation that was false; (2) the speaker knew the representation was false or made it recklessly as a positive assertion without knowledge of its truth; (3) the speaker made the representation with the intent that the other party act upon it; (4) the other party acted in reliance on the representation; and (5) the other party suffered injury as a result. *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032–33 (5th Cir. 2010) (citing *Ernst & Young*, 51 S.W.3d at 577). Fraud by omission requires that: (1) the defendant concealed or failed to disclose a material fact that the defendant knew the plaintiff was ignorant of or did not have an equal opportunity to discover; (2) the defendant intended to induce the plaintiff to act or refrain from acting by concealing or failing to disclose the fact; and (3) the plaintiff suffered injury as a result of acting without knowledge of the undisclosed fact. *Enron Corp. Secs.*, 762 F. Supp. 2d at 967. A duty to disclose arises when a defendant voluntarily discloses some information, thereby creating a duty to disclose the whole truth, or makes prior representations that become false or misleading in light of subsequently acquired information. *Shandong Yinguang*, 607 F.3d at 1032–33.

The Plaintiffs' claims for both negligent misrepresentation and common law fraud are subject to Rule 9(b)'s heightened pleading standard. *Berry v. Indianapolis Life Ins. Co.*, No. 3:08-CV-0248-B, 2010 WL 3422873, at *14 (N.D. Tex. Aug. 26, 2010); *Oaks v. Maraboyina*, No. 3:23-CV-2833-X, 2025 WL 418743, at *4 (N.D. Tex. Feb. 6, 2025) ("[W]hen fraud and negligent

48

representation claims 'are based on the same set of alleged facts,' Rule 9(b)'s pleading standard still applies").

### 1. As to Rochon and Rochon Jr.

The Court's findings in Sections IV.B–IV.E resolve the threshold pleading questions for both counts. The Gross-attributed communications satisfy Rule 9(b)'s particularity requirements as to speaker, date, form, and content. The Rochons are adequately alleged to be vicariously liable for those representations through the actual agency relationship established in Section IV.C. *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998). The Rochons' direct representations at the January 2022 dinner survive the group pleading challenge under *VeroBlue Farms*. 465 F. Supp. 3d 633, 655 (N.D. Tex. 2020). The slide deck's representations are attributable to the Rochons through the same agency relationship, notwithstanding the group pleading deficiency identified in Section IV.B as to direct individual attribution. *Id.* The representations at issue—that the platform was algorithmic and robotic, that RCP VII owned Rally, that each trade carried a 2% stop loss, and that the fund was highly liquid—constitute actionable statements of then-existing facts for the reasons established in Section IV.D. *Presidio Enters., Inc.*, 784 F.2d at 679. Reliance and proximate causation are adequately pled for the reasons established in Section IV.E. *Hoffman*, 838 F.3d at 578.

Count II adds the requirement that the Defendants knew the representations were false when made or made them recklessly as positive assertions without knowledge of their truth. *Shandong Yinguang*, 607 F.3d at 1032–33. While malice, intent, and knowledge may be alleged generally under Rule 9(b), that permissive pleading standard does not authorize bare conclusory assertions of scienter untethered from factual support. *Dorsey*, 540 F.3d at 339.

The Court finds the Plaintiffs' scienter allegations are adequately supported. Levy and Lau specifically informed the Rochons that the platform was not based on artificial intelligence and that RCP VII did not own it, yet the Rochons continued to make or ratify those representations.[107] Rochon Jr.'s directive to move the stop loss to 5,150 demonstrates that he knew the 2% stop loss representation was false, or at minimum made it recklessly.[108] His written false statements to Lau that he had already consulted investors further supports an inference of knowing concealment.[109] These specific, documented circumstances provide the factual predicate necessary to support the general scienter allegation and satisfy Rule 9(b). *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983).

Count II independently rests on a fraud by omission theory premised on the Rochons' failure to disclose: that the platform was subject to human override; that RCP VII did not own Rally; that investor funds had been deployed in an undisclosed S&P 500 short position; and that the stop loss had been moved twice without investor knowledge or consent.[110]

Each omission is adequately pled. The duty to disclose arose from the Rochons' prior voluntary representations about the platform's algorithmic nature, the 2% stop loss, and the fund's investment strategy—each of which created an obligation to disclose facts rendering those representations false or misleading. *Shandong Yinguang*, 607 F.3d at 1032–33, 1035. The materiality of each omission is self-evident given the Boeckman Parties' express reliance on the safety and liquidity attributes those representations conveyed.[111] Intent to conceal is established by Rochon Jr.'s documented false statement to Lau about investor consultation.[112] The Boeckman

---

[107] ECF No. 13. at 12.
[108] *Id.* at 10–11.
[109] *Id.* at 11.
[110] ECF No. 13 at 12–14.
[111] ECF No. 13 at 13.
[112] *Id.* at 11.

50

Parties' ignorance of the concealed facts is adequately alleged through their unsuccessful withdrawal requests and unanswered inquiries about the stop loss level.[113]

The Defendants argue that the post-investment omissions are irrelevant because they occurred after the investments were made and therefore could not have induced them. The Court is unpersuaded. The duty to disclose arising from prior voluntary representations continues so long as those representations remain operative and the investor remains in a position induced by them. *See Shandong Yinguang*, 607 F.3d at 1035. The Boeckman Parties had funds locked in a position they could not redeem and were actively seeking information. The Rochons' concealment in that context was a continuation of the fraudulent scheme, not an unrelated subsequent event. The omission also bears directly on loss causation—because the concealment of the stop loss manipulation directly enabled the catastrophic loss. *See* Section IV.E.

The Defendants cite *Spoljaric v. Percival Tours, Inc.*, for the proposition that the mere failure to perform a promise does not establish that the speaker intended not to perform when the promise was made. 708 S.W.2d 432, 435 (Tex. 1986). The principle is sound but does not prevail here for two reasons. First, the core representations in this case are statements of then-existing facts, not promises about future performance. *Spoljaric*'s protection for unfulfilled promises has no application to statements of current fact that were either true or false when made. *Presidio Enters.*, 784 F.2d at 679. Second, even as to any forward-looking return representations, the Complaint's scienter allegations do not rest on the mere fact that the representations turned out to be false. They rest on Levy and Lau's direct correction of the Rochons before the February 2023 slide deck was delivered, Rochon Jr.'s personal direction to override the stop loss demonstrating contemporaneous knowledge of the falsity of the stop loss representation, and Rochon Jr.'s

---

[113] *Id.* at 9–10.

51

documented false statement to Lau about investor consultation. These are affirmative allegations of knowing conduct, not an inference of scienter drawn from failure to perform.

Therefore, the Motion to Dismiss Counts I and II as to Rochon and Rochon Jr. is DENIED.

### 2. *Exemplary Damages*

The Plaintiffs request exemplary damages on both counts. Gross negligence requires proof that the defendant was consciously indifferent to the rights, safety, or welfare of others, s*ee* Tex. Civ. Prac. & Rem. Code § 41.001(11), while fraud and malice require intentional wrongdoing. *See id.* § 41.001(7). Rochon Jr.'s documented false statements to Lau, his deliberate concealment of the stop loss manipulation, and his repeated indifference to investor welfare plausibly support both standards at the pleading stage. These requests survive to the extent the underlying counts survive. The sufficiency of the gross negligence allegation need not be resolved at this stage. The factual record as alleged plausibly supports an inference of conscious indifference sufficient to survive dismissal.

Therefore, the Motion to Dismiss the Plaintiffs' request for exemplary damages regarding Counts I and II as to Rochon and Rochon Jr. is DENIED.

### 3. *As to Hafer*

As established in the Court's group pleading analysis, the Complaint attributes no affirmative misrepresentations to Hafer individually. No statement she made is quoted, no communication she authored is identified, and no affirmative solicitation is attributed to her. Hafer's execution of the subscription agreements as a corporate officer does not constitute a representation of false information. *Fed. Land Bank Ass'n*, 825 S.W.2d at 442. Her receipt of the January 2024 email chain post-dates all investments and cannot supply a misrepresentation

element premised on inducing those investments. *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 794 (N.D. Tex. 2009).

The fraud by omission theory likewise fails as to Hafer. An omission claim requires that the defendant had a duty to disclose and deliberately failed to do so. *Enron Corp. Secs.*, 762 F. Supp. 2d at 967. The Plaintiffs do not allege that Hafer was aware of any misrepresentations during the solicitation period, had any role in directing or approving the representations made to investors, or possessed material information she was obligated to disclose. Her corporate titles and familial relationships, standing alone, do not supply the specific factual allegations Rule 9(b) requires for a fraud by omission claim. *See Dorsey*, 540 F.3d at 339.

Thus, the Motion to Dismiss Counts I and II as to Hafer is GRANTED without prejudice, with leave to amend.

### B. Count III — Violation of the Texas Securities Act

The Plaintiffs allege in Count III that Rochon and Rochon Jr. offered and sold securities to the Boeckman Parties by means of untrue statements of material fact and omissions to state material facts necessary to make those statements not misleading, in violation of the Texas Securities Act (the "**TSA**").[114] The Defendants move to dismiss on the grounds that: (1) neither Rochon individually sold securities to the Boeckman Parties; (2) the Plaintiffs fail to allege with particularity that either Rochon was an unregistered dealer; and (3) Count III suffers from the same pleading deficiencies identified elsewhere in the Motion to Dismiss. For the reasons that follow, the Motion to Dismiss Count III is DENIED as to Rochon and Rochon Jr. and is GRANTED as to Hafer without prejudice, with leave to amend.

---

[114] ECF No. 13 at 17–18.

A claim for violation of the TSA must satisfy Rule 9(b)'s heightened pleading standard. *In re Cogent Energy Services, LLC*, No. 23-33659, Adv. No. 23-3212, 2024 WL 3770041, at *6 (Bankr. S.D. Tex. Aug. 12, 2024) (citing *Billitteri v. Secs. Am., Inc.*, No. 09-CV-1568-F, 2010 WL 6785484 (N.D. Tex. July 26, 2010)). The TSA prohibits any person from offering or selling a security by means of an untrue statement of material fact or an omission to state a material fact necessary to make the statements made not misleading. TEX. GOV'T CODE § 4008.051. Beyond direct seller liability, the TSA separately imposes liability on: (1) "a person who directly or indirectly controls a seller," and (2) "persons who directly or indirectly, with intent to deceive or defraud or with reckless disregard for the truth, materially aid a seller of a security." *Id.* § 4008.055(a), (c). Notably, the TSA does not require scienter for strict liability seller claims—it imposes liability on persons who offer or sell a security in violation of its registration requirements regardless of intent. *Dorsey*, 540 F.3d at 344. A "seller" under the TSA includes a person who solicited the sale and whose motivation was at least in part to benefit the seller. *Enron Corp. Secs.*, 540 F. Supp. 2d at 767; *Dorsey*, 540 F.3d at 343.

The Plaintiffs allege five specific misrepresentations: (1) that the Boeckman Parties were investing in a limited partnership that would manage their funds; (2) that the platform was completely algorithmic and robotic; (3) that the platform was owned by RCP VII; (4) that investments were low risk and protected by a 2% stop loss on each trade; and (5) that trades were highly liquid. These allegations track the same misrepresentations already evaluated under Counts I and II. The cross-cutting findings in Sections IV.B–IV.E establish that those representations satisfy Rule 9(b)'s particularity requirements, constitute actionable statements of then-existing fact, and are attributable to the Rochons through the agency relationship and through their direct personal conduct. Those findings apply with equal force here and are incorporated herein.

54

### 1. *As to Rochon and Rochon Jr.*

#### i. *Seller and Control-Person Liability*

The Defendants argue that neither Rochon individually sold the RCP VII securities to the Boeckman Parties and that Count III must therefore be dismissed for lack of standing. This argument misconstrues the TSA. The TSA imposes liability not only on direct sellers but also on persons who control a seller and on persons who materially aid a seller with the requisite intent. TEX. GOV'T CODE §§ 4008.055(a), (c). The Plaintiffs' allegations that the Rochons directed the solicitation campaign, personally made representations to prospective investors, and controlled RCP VII through which the securities were sold adequately support a control-person theory. *Enron Corp. Secs.*, 540 F. Supp. 2d at 767. The Rochons' documented participation in the solicitation campaign—directing Gross's marketing communications and personally repeating Gross's representations at the January 2022 dinner—places them squarely within the TSA's seller definition.

#### ii. *Unregistered Dealer Claim*

The Plaintiffs additionally allege that Rochon and Rochon Jr. were not registered dealers or acting for a registered dealer as required by Texas Government Code § 4004.051, thereby independently triggering liability under § 4008.051.[115] The Defendants contend that this allegation is conclusory and unsupported. The Court disagrees. The allegation that the Rochons solicited the sale of RCP VII units without registration is a factual assertion whose truth turns on publicly verifiable registration records rather than on information exclusively within the Defendants' possession. The Plaintiffs' allegations that the Rochons directed and personally participated in the solicitation campaign are sufficient at the pleading stage to establish that they offered or sold

---

[115] ECF No. 13 at 18.

55

securities within the meaning of the statute. Whether they were registered to do so is a threshold legal fact, not a complex element requiring detailed evidentiary support at the Rule 12(b)(6) stage.

Therefore, the Motion to Dismiss Count III as to Rochon and Rochon Jr. is DENIED.

### 2. *As to Hafer*

The Motion to Dismiss Count III as to Hafer presents a closer question than Counts I and II, and on balance the Court concludes that the Motion to Dismiss Count III must be GRANTED with leave to amend. As with Counts I and II, the Plaintiffs attribute no affirmative representations to Hafer. The question under Count III is whether her execution of every subscription agreement as manager of RCP VII's general partner (Rochon Trust) is sufficient, on its own, to establish seller, control-person, or material aider liability under the TSA.

A person who executes a legal document by which an investor subscribes for and purchases a security on behalf of the selling entity, occupies a role that plausibly touches the TSA's seller and material aider definitions. *See Enron Corp. Secs.*, 540 F. Supp. 2d at 767–70; TEX. GOV'T CODE § 4008.055. The TSA does not require scienter for strict seller liability, which means the absence of any misrepresentation attributed to Hafer is not automatically fatal to a claim premised on her role in the sale transaction itself. *Dorsey*, 540 F.3d at 343–44.

The Court concludes, however, that the Complaint does not contain sufficient allegations necessary to sustain Count III as to Hafer. The Plaintiffs do not allege that Hafer had any role in soliciting the Boeckman Parties' investments, in directing or approving the marketing of RCP VII's securities, or in the preparation or dissemination of the representations that constituted the alleged fraud. Her role as described in the Complaint—executing the subscription agreements as a corporate officer—establishes her participation in the formal mechanics of the sales transaction, but does not, on its own, plausibly establish she controlled the seller, materially aided the sale, or

offered or sold the securities within the meaning of the TSA in a manner that can be connected to the misrepresentations that form the basis of the fraud claim, and thus fails to satisfy the requirements of Rule 9(b).

### 3. *Statutory Aiding and Abetting*

The Court declines to address a statutory aiding and abetting theory under Texas Government Code § 4008.055 as an independent basis for liability under Count III. That theory was not pled in the Complaint—Count III asserts only primary liability under § 4008.051 and Count VI asserts only common law aiding and abetting fraud. Likewise, such a theory is not readily apparent on the face of the Complaint. The statutory aiding and abetting theory was raised for the first time in the Plaintiffs' Response brief. Because the Court evaluates the Motion to Dismiss on the basis of the Complaint as filed, a theory not contained in the Complaint is not properly before the Court at this stage and the Court does not address it. Should the Plaintiffs choose to replead, they may assert statutory aiding and abetting liability as a distinct theory within an amended complaint.

### C. Count IV — Delaware Securities Act

In Count IV, the Plaintiffs plead a violation of the Delaware Securities Act (the "**DSA**") as an alternative to Count III. In substance, Count IV rests on the same alleged misrepresentations and omissions underlying Counts I–III—that the Rochons induced the Boeckman Parties to invest in RCP VII through false statements about the platform's ownership, its algorithmic nature, its risk controls, and its liquidity—but invokes Delaware rather than Texas securities law as the governing statutory framework. The sole question presented by the Defendants' Motion to Dismiss as to Count IV is not whether those underlying misrepresentations are adequately pled—that question is resolved by the Court's cross-cutting findings discussed above—but whether the Plaintiffs

57

adequately allege any factual basis for applying *Delaware law* to a dispute that, on the face of the pleading, involves Texas parties, Texas conduct, and Texas losses.

In deciding which state's law applies to state-based claims, a federal court sitting in Texas applies Texas choice-of-law rules. *Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*, CIV.A.3:08CV0102B, 2008 WL 3925272, at *3 (N.D. Tex. Aug. 27, 2008), *aff'd sub nom. Highland Crusader Offshore Partners LP v. LifeCare Holdings.*, 377 Fed. Appx. 422 (5th Cir. 2010) (citing *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004)). Under Texas choice-of-law principles, courts apply the Restatement (Second) of Conflict of Laws, weighing the contacts of each state to the dispute, including where the conduct and injury occurred, the location of the parties, and where the relationship between the parties is centered. *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971); *Gutierrez v. Collins*, 583 S.W.2d 312, 318–19 (Tex. 1979)). The Fifth Circuit has recognized that choice-of-law determinations may "be resolved at the motion to dismiss stage when factual development is not necessary to resolve the inquiry." *Energy Coal v. CITGO Petro. Corp.*, 836 F.3d 457, 459 (5th Cir. 2016). At the same time, where the choice-of-law question turns on facts not yet developed, deferral to a later stage may be appropriate. *See Off. Stanford Invs. Comm. v. Breazeale Sachse & Wilson LLP*, No. 3:11-CV-0329-N, 2015 WL 13740747, at *3 (N.D. Tex. Mar. 24, 2015).

The Plaintiffs' choice-of-law problem is not a question requiring factual development but rather a pleading deficiency. Every party identified in the Complaint is a Texas resident.[116] The solicitation occurred in Texas, through emails and text messages directed at Boeckman in Texas and a dinner meeting in Texas. The investments were made in Texas. The losses were sustained in

---

[116] ECF No. 13 at 2–3.

Texas. In its current form, the Complaint contains no allegation of any contact between the alleged fraud and the State of Delaware. A plaintiff who invokes the law of another state must allege some factual basis for that state's application. *See Urban Oaks Builders LLC v. Gemini Ins. Co.*, CIV.A.4:19-CV-4211, 2021 WL 4440322, at *2 (S.D. Tex. June 17, 2021) (citing *Excess Underwriters at Lloyd's London v. Franks Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 53 (Tex. 2008); *Compaq Comput. Corp. v. Lapray*, 135 S.W.3d 657, 672 (Tex. 2004)). The complete absence of any Delaware nexus allegation in the Complaint does not present a question of fact requiring development; it presents a gap in the pleading that cannot be bridged without amendment.

The Plaintiffs argue in their Response that the subscription agreements and the RCP VII Limited Partnership Agreement contain Delaware choice-of-law provisions, and that RCP VII's organization as a Delaware limited partnership supplies the requisite connection. The Court has already declined to consider the Appendix for purposes of resolving the Motion to Dismiss; thus, those documents are not properly before the Court. Even setting that procedural bar aside, the Complaint itself contains no allegation of RCP VII's organizational state, no reference to a Delaware choice-of-law provision in any agreement, and no factual claim connecting any element of the alleged fraud to Delaware. The existence of a contractual choice-of-law clause in documents not properly before the Court on this Motion cannot bridge the gap for the purposes of this pleading deficiency in the Complaint itself.

The Plaintiffs cite to *Official Stanford Investors Committee* to argue that the choice-of-law question is premature and should be deferred to a more developed record. 2015 WL 13740747, at *3. The Court finds that *Official Stanford Investors Committee* is not reflective of the current situation. In that case, the court deferred the choice-of-law determination because competing

59

factual allegations in the complaint itself raised a genuine question about which state's contacts predominated. *Id.* Here, there is no such competition. The Complaint presents an entirely one-sided Texas contact picture with no countervailing Delaware allegations whatsoever. The Plaintiffs argue that to make a choice-of-law determination at this stage would be forcing them to pick a horse between the Texas and Delaware claims. However, the Court's finding forces no such decision. Alternative pleading is allowed. Therefore, the Motion to Dismiss Count IV is GRANTED as to all Defendants with leave to amend.

### D.  Count V — Civil Conspiracy

In Count V, the Plaintiffs allege that all three Defendants combined to perpetrate a fraud upon the Boeckman Parties. Specifically, the Plaintiffs allege that Rochon, Rochon Jr., and Hafer reached a meeting of minds to obtain and retain the Boeckman Parties' investment funds through the representations and failures to disclose that form the basis of Counts I–III, and that each committed overt acts in furtherance of that combination.[117] The underlying fraudulent acts are the same ones already discussed above. The question Count V adds is whether the Plaintiffs adequately allege not merely that the Defendants committed fraud, but that they agreed to do so in advance— a distinct and more demanding showing that Count V fails to achieve on the current pleading.

Civil conspiracy under Texas law is "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Neukranz v. Conestoga Settlement Servs., LLC*, No. 3:19-CV-1681-L, 2022 WL 19518462, at *16 (N.D. Tex. Nov. 23, 2022), *R & R adopted sub nom.*, *Neukranz v. Conestoga Settlement, LLC*, No. 3:19-CV-1681-L, 2023 WL 2555551 (N.D. Tex. Mar. 16, 2023) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983)). The necessary elements to plead a civil conspiracy claim under

---

[117] ECF No. 13 at 20.

Texas law require: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Id.* Because the underlying tort sounds in fraud, the conspiracy must be pled with particularity to satisfy Rule 9(b). *VeroBlue Farms*, 465 F. Supp. 3d at 653; *Smith v. HSBC Bank*, No. 3:15-CV-00094-P, 2015 WL 12911463, at *4 (Aug. 6, 2015) ("Where the alleged conspiracy sounds in fraud, the complaint must satisfy the heightened pleading standard in Rule 9"). Conspiracy is a derivative tort; it cannot survive if the underlying fraud claim fails. *Enron Corp. Secs.*, 762 F. Supp. 2d at 958 ("Because conspiracy to defraud is a derivative tort that includes an underlying claim of common-law fraud, under Rule 9(b) if the plaintiff fails to adequately plead fraud, the court must dismiss the conspiracy claim, too."). The underlying fraud claims survive here as to the Rochons, so that bar is cleared. The issue is the adequacy of the conspiracy-specific allegations themselves.

The meeting of minds element is the most demanding. Simply alleging a shared intent to achieve a particular objective, even coupled with a tort committed in pursuit of that objective, is insufficient. *Johnston v. Drexel*, No. CV H-16-3215, 2017 WL 11612500, at *11 (S.D. Tex. Aug. 18, 2017). The parties must have agreed to either pursue an unlawful objective or to pursue a lawful objective through unlawful means. *Id.* An alleged conspirator is liable only if he agreed to the injury to be accomplished, not merely to the conduct that resulted in injury. *Ron v. Ron*, No. 3:19-CV-00211, 2020 WL 1426392, at *2 (S.D. Tex. Feb. 4, 2020), *R & R adopted*, No. 3:19-CV-00211, 2020 WL 1700320 (S.D. Tex. Mar. 23, 2020), *aff'd*, 836 F. App'x 192 (5th Cir. 2020) (quoting *Chu v. Hong*, 249 S.W.3d 441, 446 (Tex. 2008)). And each co-conspirator must have been aware of the harm or wrongful conduct at the inception of the combination. *Johnston*, 2017 WL 11612500, at *11 (quoting *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995)). The

"mere assertion of conspiracy" and a "conclusory allegation of agreement at some unidentified point" do not suffice. *Twombly*, 550 U.S. at 557.

### 1. As to Rochon and Rochon Jr.

The Complaint's conspiracy count as to the Rochons is closer to the line than it is as to Hafer. The factual allegations establish that both Rochons jointly directed Gross's solicitation campaign, jointly appeared at the January 2022 dinner and made the same representations, and both received or were copied on the January 2024 communications in which the stop loss manipulation was orchestrated and concealed. The coordinated and mirrored conduct alleged supports a reasonable inference of an agreement between the Rochons to solicit investments through the representations they each made and ratified.

The problem is that the Plaintiffs do not allege the specific agreement, its formation, or its terms with the particularity Rule 9(b) requires. Rather, the Plaintiffs allege in conclusory terms that the Defendants had a "meeting of minds on the object or course of action, specifically to obtain and retain investment funds invested by the Boeckman Parties through misrepresentations and failures to disclose material facts," and that each committed overt acts in furtherance of that combination.[118] This is an allegation of fraud that has been relabeled conspiracy, not an allegation of the agreement that distinguishes conspiracy from the underlying tort. *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 794 (N.D. Tex. 2009) (dismissing conspiracy claim that failed to "specify who was involved, precisely what the interaction was or what actions were decided upon, or when any meeting of the minds occurred"). Nothing in the Complaint identifies when the alleged agreement among the Rochons was formed, how it was communicated between them, or what each specifically agreed to accomplish. The factual background, while detailed as to the underlying

---

[118] ECF No. 13 at 20.

fraudulent acts, does not bridge this gap. Rather, it describes what each Rochon did, not what they agreed to do together *before* doing it.

The underlying facts as alleged are not inconsistent with a viable conspiracy claim, and the pleading deficiency appears curable. Therefore, the Motion to Dismiss Count V as to Rochon and Rochon Jr. is GRANTED with leave to amend.

### 2. As to Hafer

The conspiracy claim as to Hafer is weaker still. As established above in Section IV.B, the Complaint attributes no affirmative fraudulent conduct to Hafer during the solicitation or investment period. Her overt acts consist of "allowing Rochon and Rochon Jr. to market the Rally trading platform, receive investor funds, including those of the Boeckman Parties, and direct the investment of those investor funds."[119] Simply going along with co-defendants' lawful actions does not constitute an overt act in furtherance of conspiracy. *See Orthoflex, Inc. v. ThermoTek, Inc.*, Nos. 3:11-CV-0870-D, 3:10-CV-2618-D, 2012 WL 2864510, at *7 (N.D. Tex. July 12, 2012). None of the acts attributed to Hafer are independently unlawful, and the Plaintiffs fail to allege how those acts were taken in furtherance of an agreed fraudulent scheme rather than in the ordinary course of her corporate responsibilities.

Hafer's execution of each subscription agreement on January 11, 2022 places her at the table during the active investment period. The problem is that executing a subscription agreement as the authorized signatory is consistent with the routine discharge of a corporate officer's responsibilities. The Plaintiffs do not allege that Hafer participated in the solicitation campaign, attended the January 2022 dinner, reviewed or approved the marketing materials, or had any communication with the Boeckman Parties that would connect her execution of those agreements

---

[119] ECF No. 13 at 20.

63

to awareness of fraudulent representations that induced them. Signing a legal document as a corporate officer does not, without more, support the inference that she knew the representations inducing those subscriptions were false, much less that she had agreed with the Rochons to pursue a preconceived plan to defraud the Plaintiffs. *See Chu*, 249 S.W.3d at 446 ("[Plaintiff] could only be liable for conspiracy if he agreed to the *injury* to be accomplished; agreeing to the *conduct* ultimately resulting in injury is not enough.").

Her later appearance as a recipient of the January 2024 email chain does not cure this deficiency. While it confirms her awareness of the stop loss manipulation at that point, it does not reach back in time to establish the pre-existing agreement that conspiracy requires. A co-conspirator must have been "aware of the harm or wrongful conduct at the *inception* of the combination or agreement." *Johnston*, 2017 WL 11612500, at *11 (emphasis added). The Plaintiffs' argument that Hafer's corporate titles and familial relationship supply the remaining inference of agreement is not supported by specific factual allegations adequate to satisfy Rule 9(b). *See Berry*, 608 F. Supp. 2d at 794; *see also Patel v. Pac. Life Ins. Co.*, 2009 WL 1456526, at *15–16 (N.D. Tex. May 22, 2009).

Therefore, the Motion to Dismiss Count V as to Hafer is GRANTED with leave to amend.

### E. Count VI — Aiding and Abetting

The Plaintiffs allege in Count VI that Rochon and Hafer aided and abetted the fraudulent conduct of Rochon Jr., knowing of that fraud and provided assistance that was a substantial factor in causing the Boeckman Parties' losses.[120] The Plaintiffs frame this as a common law tort claim. The threshold question presented—whether such a cause of action exists in Texas—resolves the

---

[120] ECF No. 13 at 20.

Motion without the need to reach the sufficiency of the underlying allegations. The common law aiding and abetting claim is hereby dismissed.

### 1. *Common Law Aiding and Abetting*

Texas does not recognize a cause of action for aiding and abetting fraud as a theory of liability distinct from civil conspiracy. The Fifth Circuit has declined to recognize the claim, reasoning that it cannot do so unless and until the Supreme Court of Texas expressly adopts it. *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N.A.*, 800 Fed. Appx. 239, 249–50 (5th Cir. 2020) ("[T]he Texas Supreme Court has not expressly decided whether Texas recognizes a cause of action for aiding and abetting, and when sitting in diversity, a federal court exceeds" the scope of its authority when crafting new causes of action not recognized by the state court) (internal quotations omitted); *see also Mckinney/Pearl Rest. Partners, L.P.*, No. 3:14-CV-2498-B, 2015 WL 12723054, at *13 (N.D. Tex. Mar. 12, 2015).

The Plaintiffs ask the Court to preserve the claim on the theory that the Supreme Court of Texas *may* recognize aiding and abetting liability during the pendency of this litigation. That argument is foreclosed by the principles governing the relationship between federal courts and state law. Under *Erie*, federal courts apply existing state law as declared by the state's highest court and the controlling federal circuit; they do not preserve claims in anticipation of how state law might develop. *See United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 313 (1947); *Keen v. Miller Env't Group, Inc.*, 702 F.3d 239, 243 (5th Cir. 2012) ("When making an *Erie* guess, our task is to attempt to predict state law, not create or modify it.").

Therefore, the Motion to Dismiss Count VI on the theory of common law aiding and abetting claim is GRANTED as to all Defendants.

### 2. *Statutory Aiding and Abetting*

65

The Plaintiffs argue in their Response that aiding and abetting liability exists under the Texas Securities Act, and that those statutory claims survive regardless of the fate of Count VI. The Court declines to address this argument. As established in the Court's analysis as to Count III above, no statutory aiding and abetting theory appears anywhere in the Complaint. Count VI contains a cause of action for only common law aiding and abetting fraud, and Count III contains a cause of action for only primary liability under the Texas Securities Act. A theory raised for the first time in a response brief is, therefore, not a pled claim and is not properly before the Court on this Motion. If the Plaintiffs wish to assert statutory aiding and abetting liability, they may do so in an amended complaint, at which point the Court will evaluate the sufficiency of those allegations.

Therefore, the Motion to Dismiss Count VI on the theory of statutory aiding and abetting is GRANTED as to all Defendants.

## VI.  CONCLUSION

For the reasons set forth above, the Court finds that the Plaintiffs adequately state a claim for negligent misrepresentation and common law fraud as to Rochon and Rochon Jr., and that the underlying misrepresentation allegations are sufficient to state a claim for violation of the TSA as to Rochon and Rochon Jr. The Court finds that Count IV, violation of the DSA, fails for want of any factual basis for applying Delaware law. Count V fails as to all Defendants for failure to adequately plead a meeting of the minds with the particularity Rule 9(b) requires. Lastly, Count VI fails as a matter of law because Texas does not recognize a distinct cause of action for common law aiding and abetting that is distinct from conspiracy. Therefore, the Motion to Dismiss is GRANTED in part and DENIED in part as set forth herein. As such,

**IT IS THEREFORE ORDERED** that the Motion to Dismiss Count I is DENIED as to Rochon and Rochon Jr.; it is further

**ORDERED** that the Motion to Dismiss Count I is GRANTED as to Hafer without prejudice, with leave to amend; it is further

**ORDERED** that the Motion to Dismiss Count II is DENIED as to Rochon and Rochon Jr.; it is further

**ORDERED** that the Motion to Dismiss Count II is GRANTED as to Hafer without prejudice, with leave to amend; it is further

**ORDERED** that the Motion to Dismiss Count III is DENIED as to Rochon and Rochon Jr.; it is further

**ORDERED** that the Motion to Dismiss Count III is GRANTED as to Hafer without prejudice, with leave to amend; it is further

**ORDERED** that the Motion to Dismiss Count IV is GRANTED as to all Defendants without prejudice, with leave to amend; it is further

**ORDERED** that the Motion to Dismiss Count V is GRANTED as to all Defendants without prejudice, with leave to amend; it is further

**ORDERED** that the Motion to Dismiss Count VI is GRANTED as to all Defendants without prejudice to the extent such cause of action is ever recognized at state law; it is further

**ORDERED** that the Motion to Dismiss the claims of Howd and E. Boeckman is GRANTED without prejudice, with leave to amend; and it is further

**ORDERED** that any amended complaint must be filed within 21 days.

### ### END OF ORDER ###